[No. S066527. Aug. 28, 2008.]

THE PEOPLE, Plaintiff and Respondent, v.
GUNNER JAY LINDBERG, Defendant and Appellant.

**COUNSEL**

Michael J. Hersek, State Public Defender, under appointment by the Supreme Court, and Ronald F. Turner, Deputy State Public Defender, for Defendant and Appellant.

Bill Lockyer and Edmund G. Brown, Jr., Attorneys General, Robert R. Anderson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Rhonda L. Cartwirght-Ladendorf and Adrianne S. Denault, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**MORENO, J.**—A jury found defendant Gunner Jay Lindberg guilty of the first degree murder (Pen. Code, § 187)[1] of Thien Minh Ly and found he personally used a knife (§ 12022, subd. (b)). The jury further found true special circumstance allegations that defendant committed murder in the attempted commission of robbery (§ 190.2, former subd. (a)(17)(i), now subd. (a)(17)(A)) and because of the victim's race, color, religion, nationality, or country of origin (§ 190.2, subd. (a)(16) ("hate-murder" special circumstance)).

At defendant's penalty trial, the jury returned a death verdict. The trial court denied defendant's motion for new trial (§ 1181) and automatic application to modify the penalty verdict (§ 190.4, subd. (e)) and sentenced him to death. This appeal is automatic. (§ 1239, subd. (b).)

We affirm the judgment.

## I. FACTS AND PROCEEDINGS

### A. *Prosecution Guilt Phase Case*

#### 1. *The Murder of Thien Minh Ly*

Defendant concedes that the prosecution proved he murdered Ly on the Tustin High School tennis courts on January 28, 1996.

The evidence showed that on January 28, 1996, between 8:30 and 9:00 p.m., Thien Minh Ly left his family's home in Tustin wearing his Rollerblades and leaving behind his wallet and car keys. When Ly did not return home, his family telephoned the police the next day.

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

On the same morning, around 7:45 a.m., Frank Armenta, a groundskeeper at Tustin High School, noticed someone wearing Rollerblades lying on one of the tennis courts. As he approached, Armenta noticed the person was not breathing and saw blood on his shirt and a cut on his neck. He asked two nearby school employees to call the police.

When the police responded, they found Ly dead. Next to Ly's body, they recovered a cap and a single key on a keyring. The key fit the locks at Ly's residence.

Ly had suffered multiple injuries. A pattern contusion (i.e., having "some pattern-like linear marking") and abrasion comprising an area about five inches by four inches appeared on the right side of Ly's face, extending from his forehead to his right cheek and ear. A contusion and an abrasion appeared on the left side of Ly's forehead, and a contusion appeared on his mid-nose area and below his left eye. Redness was visible on his left cheek. Ly had suffered five-and-a-half-inch and three-and-a-half-inch slash wounds on the right and left sides of his neck, respectively. Each of these wounds had irregular edges, suggesting the perpetrator did not inflict a single wound, but probably cut and then extended the cut. The slash wounds to Ly's neck had been inflicted close in time to his death but not postmortem. Ly had suffered multiple deep stab wounds on the right and left sides of his chest that penetrated his internal organs, linear abraded areas that were consistent with being caused by the pulling of a knife from a deep penetrating wound, stab wounds on his right upper arm, a stab wound in his abdominal area, and an abrasion on his right hand. Some of the chest wounds penetrated through the body. Ly had suffered about 22 wounds to his chest and abdominal areas, some inflicted from the front and some from the back. Each wound had been inflicted by a single-bladed knife or sharp object with a blade about an inch to an inch and a quarter in width. The maximum depth of penetration was about four and one-half inches. Ly had been stabbed about 14 times in the heart. The multiple stab wounds that perforated Ly's heart, both lungs, diaphragm, liver, duodenum, and kidney had caused Ly to bleed to death.

2. *Defendant's Confession to Ly's Murder*

Walter Ray Dulaney IV, also known as Robert Dulaney, testified he was defendant's cousin and friend and had known defendant all his life. Dulaney previously had been convicted of first degree assault and burglary and, at the time he testified, was in custody in Missouri for shooting at someone.

Sometime during the five years before trial, Dulaney, defendant, and defendant's brother Jerry[2] formed a gang called the Insane Criminal Posse (ICP). In 1995, primarily at defendant's urging, the gang became involved in the White power movement. By "White power," Dulaney meant that Whites were superior to all other races. He said defendant shared this view. Dulaney, who was part Japanese, did not consider himself to be any race other than "American."

On February 29, 1996, Dulaney, who was living in Alamogordo, New Mexico, received a handwritten letter from defendant dated February 23, 1996 (the February 23d letter). Defendant had addressed the letter to "Dear Bro, ex-con 2/11 Rob" and stated in relevant part: "Oh, I killed a jap a while ago. I stabbed him to death at tustin High school I walked up to him Dominic was with me and I seen this guy Roller blading and I had a knife. We walked in the tennis court where he was I walked up to him, Dominic was right there. I walked right up to [illegible] him and he was scared I looked at him and said, 'oh, I thought I knew you' and he got happy that he wasn't gona get jumped. then I hit him with one of my mother fuckers and he feel on the ground and he said in a very low voice 'what the fuck' and 'you can have whatever I got.' I have nothing only a key. You can have it' then I said 'you got a car,' oh I pulled the knife out a butcher knife! and he said 'no' then I put the knife to his throught and asked him 'Do you have a car.' And he grabed my hand that I had the knife in and looked at me, trying to get a discription of me so I stomped on his head 3 times and each time said 'stop looking at me' then he was kinda knocked out Dazzed then I stabbed him in the side about 7 or 8 times he rolled over a little so I stabbed his back about 18 or 19 times then he layed flat and I slit one side of his throught on his jugular vain. Oh, the sounds the guy was making were like uhhh then Dominic said, 'do it again' and I said 'I already did, Dude' 'ya, do it again' so I cut his other juggular vain, and Dominic said 'kill him do it again.' I said, 'he's already dead' Dominic said, 'stab him in the heart.' So I stabbed him about 20 to 21 times in the heart and we took off. . . . [T]hen I wanted to go back and look, so we did and he was dieing just then taking in some bloody gasps of [illegible] air so I nudged his face with my shoe a few times then I told Dominic to kick him, so he kicked the fuck out of his face and he still has blood on his shoes all over [smiley face] then I ditched the knife, after whiping it clean onto the side of the I5 freeway [smiley face] here's the clippings from the news paper and we were on all the news channels 2/11 Insane Loc in having a ball in tustin wish you were here. . . ." (Errors in original.)

---

[2] Dulaney testified that defendant at various times used the name of his brother, Jerry Lindberg, as well as the name "Gunner Dulaney," and the nickname, "Swiss G."

After Dulaney read the letter, his wife gave it to his mother and stepfather, who then gave the letter to Alamogordo police, all of which occurred on the same day. Alamogordo police brought the letter to the attention of the Orange County District Attorney's Office and Tustin police.

The next day, March 1, 1996, Dulaney spoke by telephone to defendant who told him the murder "gave [him] a rush," "like a high. Better than a drug." Defendant told Dulaney that he "killed the Jap," that he "slit his throat and stabbed him a whole bunch of times," and that he "couldn't stop." Defendant told Dulaney he killed Ly "for racial movement [sic]."

On March 5, 1996, Tustin Police Detectives Todd Bullock and Bruce Williams interviewed Dulaney about the letter he had received from defendant. Dulaney denied he had spoken with defendant since he had received the letter because he did not want defendant to be in more trouble than he already was. When Detective Bullock asked Dulaney how defendant felt about Asians, Dulaney said he did not know, as they never talked about it.

Dulaney later moved to Missouri with his wife. Sometime in the early part of 1997, while living in Missouri, Dulaney was shot in the stomach by somebody who yelled, "You want to put your cousin on death row, here is death row." Dulaney did not seek medical help, but pulled the bullet from his stomach himself using tweezers and a lug wrench as he had been trained to do in the "Young Marines."[3] Dulaney did not report the gunshot wound to police because, at that time, he did not want to violate the conditions of his parole and return to prison.

On April 11, 1997, Dulaney telephoned Carl Waddell, an investigator with the Orange County District Attorney's Office, and informed him that defendant had told him the murder was racially motivated. On April 24, 1997, investigator Waddell and Tustin Police Detective Thomas Tarpley interviewed Dulaney in Missouri.[4] Dulaney repeated that defendant said the murder had been committed for "the racial movement." Dulaney said he had not previously told the police about his telephone conversation with defendant because he was afraid and did not want to snitch on defendant any more than he had. Dulaney told investigator Waddell that "when he [Dulaney] testified that he was a dead man."

---

[3] At defendant's request, during defendant's trial, Dr. Richard Fukumoto, a pathologist with the Orange County Coroner's Office, examined Dulaney's stomach wound. Dr. Fukumoto observed an almost circular scar between the size of a dime and that of a nickel just above the beltline on the left side. Dr. Fukumoto testified the size of the scar was consistent with a .38-caliber bullet. Dr. Fukumoto could not rule out the possibility that Dulaney had been shot with a bullet and had cauterized the wound.

[4] During this interview, Detective Tarpley observed Dulaney's stomach wound and believed it was a "more recent wound" that had not yet completely healed.

Sometime before he telephoned Waddell on April 11, 1997, Dulaney received a letter from defendant while defendant was in custody awaiting trial in this case. In the letter, defendant wrote that Dulaney's parents were "2/11," meaning they were dead because they had turned defendant in. Dulaney and defendant also used the term "2/11" to mean "armed robbery" to show that their gang was "for real" and not "some punk gang or nothing." After giving defendant's February 23d letter to police, Dulaney was afraid defendant would kill him. Dulaney became depressed and admitted himself to a "mental rehab" facility because he felt responsible that defendant could receive the death penalty. Dulaney received no promises from either the prosecution or the authorities in Missouri in exchange for his testimony at defendant's trial.

### 3. *Defendant's Arrest and the Search of His Apartment*

In the early morning hours of March 2, 1996, police officers executed a search warrant at defendant's apartment in Tustin with the assistance of the Orange County Sheriff's Department SWAT team. They arrested defendant, who was in the living room, and Domenic Christopher,[5] who had fled through a window but was quickly apprehended nearby. Bob Mix, who was present in the apartment with defendant, was detained and taken to the police station.

On a wall in the bedroom shared by defendant and Christopher, police officers observed a poster that read across the top, "Celebrate Martin Luther King Day" ("Martin Luther King" poster). The bottom of the poster read, "If they would have shot four more, we could have had the rest of the week off from work." The word "death" was written below "Luther" in "Martin Luther King."

The police seized the following items from defendant's bedroom.

(1) A notebook containing writing on numerous pages. One writing was entitled *Blessed Be Ye Ears* that discussed "killing the meek," talked extensively about "devastation and death," called Robert Dulaney "Ex-Con," stated that "Dominic" was a "2/11" member but had not reached any "levels," and declared that "Death is apperant in all my members eyes, kill spill the blood of the meek. The meek shall inharent shit. The stronge shall survive my tounament of death" (errors in original);

(2) a box bearing the words "Mixed Fruit" and "Gunner's Box," and two pairs of gloves on top of the box;

---

[5] Before the parties made their closing argument, the trial court granted defendant's request to take judicial notice of copies of court records in *People v. Christopher* (Super. Ct. Orange County, 1997, No. 96CF1165), showing Christopher had been charged by information with the murder of Thien Minh Ly and found guilty of the first degree murder of Ly. The trial court informed the jury of the judicially noticed court records.

(3) a Bible with "Presented [¶] to ~~Bambi~~ [illegible] [¶] by Gunner Lindberg" inscribed on the inside front cover and listing the names of White supremacist organizations, a White supremacist leader, and a White supremacist newsletter on the last several pages. Inserted among the pages of the Bible were various papers and printed material, including:

(a) an application for the N.A.A.W.P. (National Association for the Advancement of White People);

(b) a newsletter dated August 1994 and entitled "The Talon Euro-American alliance" that described the Aryan movement, noting it "courageously offer[s] the White race its only hope for survival";

(c) a piece of paper that read "Failure to speak up, a silent and deadly killer" written by Jack Mohr, a "Brigadier General" who heads a White supremacist organization known as "The Crusade for Christ and Country," an envelope showing Mohr's return address that was addressed to defendant, an envelope and a letter dated October 31, 1994, addressed to Mohr and showing defendant's name and return address, and two handwritten letters from Mohr addressed to defendant;

(d) a printed form entitled "The Nationalist Party of Canada Membership Oath" that read, "I declare that I am a racist who respects other races with common sense and good will and fair play towards the maintenance of my racial integrity and identity. [¶] I pledge to establish and maintain the constitutional racist state homeland. . . ."; and

(e) a piece of paper bearing the title "Pro White Organizations," listing the name and addresses of 12 organizations, including the Aryan Research Fellowship, the Ku Klux Klan, and the White Aryan Resistance;

(4) a cardboard box bearing the words "2/11 Insane LOC," "Insane Loc," "I.C.P.," and "O.G.," with lightning bolts and two swastikas;

(5) a plastic skull with a motorcycle helmet bearing a swastika across the top; and

(6) a T-shirt belonging to defendant with a small bloodstain about the size of a nickel.

### 4. *Defendant's Statements to Police*

After his arrest, defendant was transported to the Tustin police station. Police Detective Todd Bullock advised defendant of his rights under

*Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602], which defendant waived. Bullock conducted two audiotaped interviews of defendant. During the first interview, defendant admitted he had heard about the murder of Thien Minh Ly but denied any involvement.

During the second interview, conducted by Detectives Bullock and Mike Clesceri, defendant admitted that "2/11" meant "armed robbery" and that he "wrote the whole [February 23d] letter" to Dulaney to boast and impress his cousin. Defendant maintained the statements in the letter meant nothing to him. Defendant said he had heard about the crime from newspapers and television. He admitted he sent one of the newspaper articles to Dulaney along with the February 23d letter as proof he had written the letter.

Defendant said he was interested in the murder "[c]ause it was an ethnic," and "[i]t wasn't a White person." Defendant acknowledged his letter to Dulaney was "nice and detailed." He said he made up the details, including the seven or eight stab wounds he inflicted to Ly's side and the 18 or 19 stab wounds he inflicted to his back, and acknowledged the newspaper articles specified only that Ly suffered "multiple" stab wounds. When asked where he had heard about Ly's having a key, defendant said he "[j]ust thought of it" and acknowledged he did not learn about this detail from the newspaper or television news. Defendant admitted that it was "[k]ind of odd" that Ly had only a key found next to his body and that defendant had written in the February 23d letter that Ly said he had nothing but a key.

### 5. *Forensic Evidence*

DNA samples were obtained from dried bloodstains on three areas of the right-hand black glove found on the box in defendant's bedroom. One of these DNA samples was mixed, containing DNA from two sources. Ly's DNA was consistent with the sample DNA from all three areas of the glove. Defendant's DNA was consistent with being one of the sources of the mixed sample. Christopher was excluded as being a contributor of the blood tested on the glove.

The percentage of the population that could be excluded as having been the source of the bloodstains on the gloves was 99.999 percent. Based on FBI national population databases, estimates of the frequency with which the DNA pattern found on the right-hand black glove (excluding the mixed DNA sample) occurred was one in two million in the Asian population, one in 30 million in the Caucasian population, one in 10 million in the African-American population, and one in three million in the Hispanic population.

The bloodstain found on defendant's T-shirt that was seized from his bedroom was consistent with the genetic markings of Christopher, but not Ly.

### 6. Prior Acts Evidence

#### a. Attempted Robbery of Emelio Reyes-Martinez

In October 1990, defendant, who was 15 years old, and Kenny Harp went to a field near San Diego to rob Hispanic people. Defendant and Harp knew that Hispanics who worked in the field were paid in cash. Emelio Reyes-Martinez, a Hispanic landscaper, was walking through the field to obtain water and saw Kenny, defendant, and three other boys approach.[6] Defendant held a stick about two feet long and two and a half inches in diameter in his right hand behind his back. Defendant gestured with his left hand towards Reyes-Martinez, moving his fingers, and demanding, "Money, money, money." When Reyes-Martinez told defendant he did not have any money, defendant hit him on the head with the stick. Reyes-Martinez again told defendant he did not have any money, and defendant again hit him with the stick. Defendant struck Reyes-Martinez's right arm, causing the bone to protrude.

Believing the beating was not going to stop, Reyes-Martinez began to run and yell for help. Defendant and Harp followed, pulled at Reyes-Martinez's arms, and kicked him until he stumbled and fell. Reyes-Martinez managed to get back up and started running again, bleeding from his face. Reyes-Martinez thought that if he fell again, defendant and Harp would "hit [him] to a pulp." Defendant and Harp continued to beat Reyes-Martinez, hitting him from behind. Reyes-Martinez lost $200 or $210 in the attack. Reyes-Martinez's friends chased defendant and Harp away. Reyes-Martinez was taken to the hospital, where he received 14 to 19 stitches.

#### b. Attempted Robbery of Helen Tillman

On October 31, 1990, defendant and Zachery Ellis, both 15 years old and armed with knives, entered the home of Helen Tillman, an elderly woman who lived alone, and demanded her money. At trial, Tillman testified a man held a knife to her neck while restraining her. Defendant or Ellis took $90 that Tillman had in her purse in her bedroom. Before leaving, defendant struck Tillman on the right side of her face with his hand, knocking her onto the counter and causing her face to swell and bruise.

On November 1, 1990, defendant admitted to Oceanside Police Officer James Sandifer that he and Ellis had entered Tillman's residence through a sliding door. Defendant claimed Ellis went into a back room while he

---

[6] Although Reyes-Martinez saw about five boys approaching him in the field, he testified that only defendant and Harp hit him during the attack.

remained in the kitchen with Tillman. Defendant held Tillman by the back collar of her shirt and admitted he punched her on the right side of her face because he feared she might escape. Defendant denied having a knife, but admitted he and Ellis took money from the back bedroom.

Ellis admitted to Officer Sandifer that he was defendant's friend and that both he and defendant had been armed with knives when they robbed Tillman. Ellis had difficulty remembering details of the incident, but testified it was defendant's idea to enter Tillman's residence. Ellis confirmed that on June 11, 1997, he told investigator Waddell that defendant came out of the back room and hit Tillman.

### 7. Evidence Offered to Support the Hate-murder Special-circumstance Allegation

#### a. Defendant's Assault on Tung Le and His Statements While in Jail

In July 1997, Alejandro Villa, who previously had been convicted of and imprisoned for numerous crimes, including commercial burglary, grand theft from a person, grand theft auto, and petty theft, was incarcerated in the same area of the Orange County jail where defendant was in custody awaiting trial in this case. At the time of defendant's trial, Villa was facing charges for armed robbery, assault on a peace officer and emergency personnel, battery on a peace officer and emergency personnel, escape from jail with felony force, and possession of hypodermic needles and syringes.

Tung Le, an Asian inmate, was placed in the same jail modular group as Villa and defendant. Before Le arrived, defendant told Villa he wanted Le to be put in their group. When Le arrived, defendant appeared to be excited, rubbing his hands together and smiling at Le. Defendant told Villa he did not like Le and thought Le was "a punk, fucking nip," and that he was "going to get [Le]." At times, when defendant watched Asians on television, he would mumble or say something.

While playing cards in the dayroom, defendant threw Le against a wall and choked him because Le accused defendant of not following the rules of the game. On another occasion, during shower call, defendant choked Le in the shower to the point that Le's face was purple and blue and his veins and his eyeballs were bulging. When Villa warned defendant that he was going to kill Le, defendant told Villa, "[Le] is going to tell, he is going to rat. I got to kill him. I got to kill him." Villa then pulled defendant off Le.

While in jail, Villa came to believe that defendant hated Asian people based on comments he had heard defendant make. Defendant said that Asian

speech sounded like "mice talking, like a fast-forward cassette. . . ." Defendant told Villa he was in jail "for stabbing a Nip to death." Defendant explained that as the knife was going in, "it was a—fleshy kind of sound and feeling." Defendant stated that he told a friend, "Let me show you how easy it is to kill a Vietnamese and get away with it." Defendant also made "wise cracks" about being the "best tennis player" because of what had happened on the tennis courts.

Villa denied that he expected to receive anything from the Orange County District Attorney's Office in exchange for his testimony in this case.

b. *Defendant's Statements to Ellis and Coworker Rochelle Lopez*

Sometime before defendant and Ellis robbed Tillman on October 31, 1990, defendant told Ellis that he disliked Asians because he "got kicked off Okinawa." Defendant referred to Asians as "gooks" and Hispanics as "spick[s]" and "wetback[s]."

Between November 3, 1995, and January 28, 1996, Rochelle Lopez worked with defendant, whom she knew as Jerry Lindberg, at a Kmart store in Tustin. On one occasion in the employee lunchroom, an African-American employee came in, said hello, and then left the area. Defendant told a supervisor, "I hate that nigger bitch. She got on my nerves," or something to that effect. On another occasion, some Asians walked into the store and defendant said, "There goes gooks," or words to that effect. On January 10, 1996, about two and a half weeks before the murder of Thien Minh Ly, Lopez left Kmart with Christopher and saw defendant, who was part of a crowd, pushing and screaming at an Asian man. The man asked defendant, "Why are you doing this to me?"

c. *Defendant's Written Statements to Dulaney While Incarcerated on Another Matter Before Ly's Murder*

In a letter to Dulaney postmarked November 3, 1993, defendant wrote, in part, "Dog, its time to look in to the future this nation is comming to a hult with the niggers and us. We must choose sides now! for time is comming fast here is an address for Aryan Racial Unity: Nationalist Party of Canada . . . . [¶] Write them and get some info and littiture ok and copy it and we'll bring the 2/11 war party into effect. . . . [¶] Well, cuz I wan't to get this address to you so you can get some info. . . . Tell them you want to get your own party going and would like littiture to start a part of your own or would like to become apart of your party OK!" (Errors in original.)

In a letter to Dulaney dated March 10, 1993, defendant stated, in part, "Well, its different on the streets. I run the W.A.R. group in here. White Arian

resistanse is a action group—were a branch of NVAP National Vastal Arian Party they dictate we react. in other words they talk—we back them with violence. Oh, yes, were still runnin ours! Its up to you if you can handel it—I know you can, but without bustin probation is the question. Ask them what there about, and if they say violence or anything of that nature you know there solid Dogs. If not don 't fuck with them." (Errors in original.)

In a letter to Dulaney dated February 13, 1994, defendant stated, in part, "I hate hole time! I've wrote many people no one writes the Gun back, I feel lonely dog! All I keep lookin forward to is Aug 3rd then I'll be free, Hey bro I'll be the first to say doing time is fuckin hard. After a while you change, your mind just relates to this kind of life. And that's not cool because I'm pure fucking evil dog and thats no shit. All I want to do is hurt and kill, I think of many ways to hurt the Mt. Vernon people. And I have one!" Defendant ended the letter with "KILL" (with the "K" written in a style resembling a Nazi swastika), and "kill-kill-kill-kill-kill-kill-kill" followed by "Them all! with love, insane Loc OG for life." (Errors in original.)

> d. *Defendant's Written Statements to Others While in Custody in the Orange County Jail Awaiting Trial in This Case*

In an undated letter to Kelly Dresen, defendant wrote, "I'm White to the bone. 1/2 german 1/2 Indian and I'm 100% against black. [¶] My trial date is now July 21st, my crime partner got convicted of 1st degree murd[er] goes back May 25th for sentencing. I feel sorry for him all he did was stand there well I'm shure you don't want to hear all that." (Errors in original.)

In a letter to Jeremie Overstreet, defendant drew two lightning bolts and wrote the phrase, "stay White," followed by, "No better not them hong kong fuee's might not like you!" (Errors in original.)

In a letter to Tammy Shoopman, defendant said, "You herd of Tustin High School? Well a Chino got stabbed to Death on the tennis courts at Tustin High School while roller Blading. I have a 187—211—and Hate crime." (Errors in original.)

In an undated letter to Samantha Roby, defendant wrote, "Not much has changed with me always in trouble—But this time I really did it. I have a 1st degree murder robbery and hate crime and the state of California wants to give me the death penalty." (Misspellings and grammatical errors in original.) Defendant then detailed the murder of Ly, explaining, "Well Super Bowl Sunday '96' Dallas over Pittsburg, A friend and I were walking home from work—K-mart—I was a stocker. And we were walking through a high school

and my friend saw this dud and asked if I could kick his ass, I was stoned, and said of course, walked in and blam I knocked him out with one punch—you know me—And we waited for him to get up. [¶] When he did he layed there, and was looking at me. I was already on the run from Mt. Vernon shooting some people with a shot gun. So I thought he was trying to get a discription of me, so I stomped on his head, then stabbed him over 51 times, and slashing his neck. Then we left the guy was Asian so now I'm charged with a 1st degree murder robbery, and a hate crime—so the want the Death Penalty. Yah I fucked up big this time." (Errors in original.)

In an undated letter to Vanessa Smrekar, defendant admitted, "I'm in on a 1st degree murder, hate crime and robbery. But, I'm no thief and I'm only ALiL racist." (Original formatting.)

e. *Expert Testimony on White Supremacists and White Supremacy Beliefs*

Huntington Beach Police Department Sergeant Ronald Miller testified for the prosecution as an expert on the subject of White supremacy. Miller testified that a "White supremacist" is "a racist who is oriented toward the superiority of the White race, believing that it is above all others. They tend to view minorities as . . . sub-humans. [¶] They are also quite often Antisemitic [*sic*], even to the point that they label the Holocaust as a Jewish trick to garner support and sympathy for the Jews throughout the world. [¶] Those are the two major tenets of the White supremacist." Based on his extensive experience with White supremacists and White supremacy groups, defendant's own words in his letters, the groups with whom defendant associated, and defendant's use of the Nazi "SS" lightning bolts and the swastika symbols, Miller opined that defendant was a White supremacist.

B. *Defendant's Guilt Phase Case*

Walter Ray Dulaney III, Robert Dulaney's father, testified that, in his opinion, Robert was a compulsive liar most of the time who liked to brag and tell "big stories." For example, Robert told his father that he had an IQ of 550 and had once run a marathon between Missouri and Hawaii. Walter Dulaney testified that Robert was not, and could not be, a member of any White supremacy groups because Robert was Japanese and Apache Indian. Walter Dulaney stated that on one occasion when Robert was in jail, he was put "in the nut ward."

Walter Dulaney had known defendant all of defendant's life. He had never heard defendant utter any racial slurs and had no information suggesting that defendant was involved in White supremacy organizations.

On cross-examination, Walter Dulaney admitted that Robert had a swastika tattoo and an "S.W.P." tattoo on his hand and that "S.W.P." could stand for "Supreme White Power." Walter became angry at Robert and his mother and stepfather because they gave defendant's February 23d letter to the police. Walter believed a person should not "rat on family." Walter had suffered two prior felony convictions, one for stabbing someone who molested his granddaughter and another for transporting drugs.

Christina Colby worked with defendant[7] at Kmart in January 1996. She dated defendant and never heard him use any racial slurs or call Asians by any derogatory names. Colby knew defendant for only three months. On cross-examination, Colby testified that she had seen the "Martin Luther King" poster in defendant's bedroom and that defendant told her it had belonged to his dead brother.

Roger Scharf, a private investigator retained by the defense, testified that the inline skates worn by Thien Minh Ly on the night of his death were Rollerblades, model LS Lightning. At the time of Ly's murder, the skates sold for $139.

On the night before he testified, Scharf and another investigator went to the Tustin High School tennis courts to determine whether someone standing inside the courts could be seen by a person walking along the sidewalk directly outside the courts and around the perimeter. Scharf attempted to simulate the lighting and weather conditions on the night of the murder. The other investigator stood inside the courts about eight feet away from the outside fence. Scharf testified that the screen around the courts "almost totally blocks your vision under good conditions." Scharf could not see the investigator standing on the court. When Scharf shined his flashlight through the screen, he could make out the investigator's image but not his facial features. When Scharf had the investigator move toward him, to within five feet, he could see that the investigator's skin was light but could not tell his hairstyle or distinguish racial features.

## C. *Prosecution Penalty Phase Case*

### 1. *Randy Bowers Assault*

Around 1992, defendant and Randy Bowers got into an argument, during the course of which Bowers cursed at defendant's mother. The police were called and warned Bowers to stay away from defendant. In July 1995,

---

[7] Colby knew defendant as "Jerry Lindberg," one of several names he used, as discussed above.

defendant told Bowers he wanted Bowers dead. Defendant and Bowers agreed to fight one evening on Hell's Road. Bowers and a couple of his friends brought bats to defend themselves. As Bowers drove onto a driveway, he saw defendant on the tailgate of a truck, holding a shotgun. The truck was parked on the side of the road. Defendant shot through the windshield of Bowers's car, striking Neal Eubank in the arm and near his right eye. When Bowers put his car in reverse, he noticed six of defendant's friends armed with bats and "lots of guns, 22's."

Bowers and Eubank sought help from a nearby resident and entered the resident's house. The occupants wrapped Eubank's arm and called the police. Meanwhile, defendant, armed with a .410 shotgun, entered the house and asked Eubank, "Hey pussy, how do you feel now?" Bowers ran away carrying a baseball bat, but got caught in a nearby barbed wire fence. Defendant pointed his shotgun at the back of Bowers's head. Eventually, Bowers untangled himself, jumped over the fence, and ran away from defendant. During the chase, Bowers heard gunshots that sounded like they were fired from a .410 shotgun and a ".22 shotgun."

### 2. *Timothy Branham Assault*

On December 26, 1991, in Mount Vernon, Missouri, 17-year-old Timothy Branham and his brother had skateboarded to a local store and were waiting for a nearby business to close so they could skate on its property. Defendant, standing nearby, asked Branham if he had a problem. Branham said no. Defendant walked up and hit Branham in the face, causing him to fall to the ground. Defendant kicked him three or four times in the ribs. Defendant took Branham's skateboard but later gave it to someone, who returned it to Branham.

### 3. *Nicholas Gari Shooting*

On January 19, 1992, in Mount Vernon, Missouri, Nicholas Gari and two friends were riding their bikes in a local park. Defendant and other boys were also in the park, armed with BB guns. At some point, the cap Gari was wearing was hit by a BB and he fell off his bike; Gari saw defendant standing in the woods nearby and told defendant that he was a "cop's son." Defendant chased him about 30 feet and shot him in the neck. As defendant and his two friends ran away, defendant proclaimed, "I blew a hole in his neck." Gari did not know defendant.

Gari was taken to a hospital and underwent two surgeries on his throat. The surgeon was unable to remove the BB, which had traveled to Gari's heart.

### 4. *Jeffrey Prewitt Assault*

On January 25, 1992, Jeffrey Prewitt, a detention supervisor at the Jasper County Juvenile Detention Center in Joplin, Missouri, was supervising three or four juveniles, including defendant, in the dayroom. After defendant finished a telephone call, he started hitting Prewitt on the top of his head and on his forehead. Prewitt pushed defendant away. Another employee called police. Defendant stopped fighting. Prewitt suffered knots on his head and a black eye.

### 5. *Victim Impact Testimony of Thien Minh Ly's Brother, Thai Ly*

Thai Ly testified he had always looked up to his 24-year-old brother, Ly, who was the oldest of three children. Ly had attended Georgetown University and had returned to California to work with a charity organization that helped minorities, mostly Vietnamese. When Thai heard that Ly had been murdered, he felt dead and numb, as if he had no life going through him. Since the murder, Thai's life has lacked direction and inspiration.

Every day since the murder, Thai's mother and father go to Ly's room, which has remained essentially untouched, and cry. Ly's death also has been "incredibly hard" on his sister. His death has deeply affected the lives of his family and friends.

## D. *Defendant's Penalty Phase Case*

### 1. *Sergeant Russell Hayes*

In 1995, defendant and Gary Wolfgram lived with Marine Corps Sergeant Russell Hayes and his family for one or two months. Hayes did not know defendant before he moved into the house and later learned that he and Wolfgram were not cousins, as defendant had initially represented to Hayes.

During the time defendant lived with Sergeant Hayes, he took Hayes's three young children to a nearby park where children of other races played. Occasionally, a friend of Hayes's would drop off his Japanese daughter at the Hayeses' house. Hayes's best friend was an African-American man who often visited the house. Hayes was not aware of any problems between defendant and his African-American friend. Hayes never heard defendant utter any racial slurs.

### 2. *Drugs Found During Search of Defendant's Apartment*

During the search of a box found in defendant's bedroom by police on the day of defendant's arrest, police discovered baggies of marijuana and a baggie of methamphetamine.

### 3. *Clinical Psychologist Roberto Flores de Apodaca*

Roberto Flores de Apodaca, Ph.D., a clinical psychologist, examined defendant four days before he testified.[8] He took a history from defendant and reviewed other documents regarding defendant. Dr. de Apodaca did not believe all of the responses defendant provided during the interview.

When Dr. de Apodaca asked defendant about his "211" tattoo, defendant responded that he always said it meant "armed robbery" but that it actually meant "those that lock you up shall pay." Dr. de Apodaca understood this to mean defendant could "harbor animosity and vengefulness toward those who incarcerate him."

Based on defendant's history, Dr. de Apodaca testified defendant had a "disorganized, tumultuous, dysfunctional" family background, with a number of "losses" and "breaks in his family relationships, notably with his biological father" when defendant was about two years old.

Defendant told Dr. de Apodaca that he had smoked marijuana, drunk alcohol, smoked cigarettes, and used methamphetamine during his adolescence. Dr. de Apodaca testified he had reviewed reports in which defendant was referred for treatment for substance abuse and on that basis, made a similar diagnosis.

Dr. de Apodaca diagnosed defendant with personality disorder not otherwise specified, with components of dependency, narcissism, and antisocial behavior, and secondarily with being polysubstance dependent. The antisocial features included victimizing and violating the rights of others.

Dr. de Apodaca testified that he was not opining that Ly's murder was drug induced. Dr. de Apodaca could not "rule[] out" or "rule[] in" that defendant suffered from brain damage. He agreed that such a determination would require a neurological and psychological assessment.

### II. Guilt Phase Issues

### A. *Asserted Trial Court Error in Admitting Evidence of Defendant's Two Prior Uncharged Robberies*

Before trial, the prosecution moved to admit evidence that defendant committed the uncharged Reyes-Martinez and Tillman robberies in order to

---

[8] Defendant agreed to talk with Dr. de Apodaca only after he had been convicted of first degree murder and the special circumstances had been found true.

prove that defendant intended to rob Ly during the course of murdering him. The prosecution argued the evidence was admissible under Evidence Code section 1101, subdivision (b), because the crimes shared numerous similarities: in each of the prior robberies, defendant had a companion to assist him in the robbery; he robbed and assaulted the victims; he was the aggressor of the two assailants; he attacked a vulnerable victim who was a stranger to him; the victim did not fight back; he assaulted his victim whether or not the victim cooperated; and he had a dual purpose to steal from and assault each victim.

Defense counsel argued the evidence was irrelevant, more prejudicial than probative under Evidence Code section 352, and impermissible propensity evidence under Evidence Code section 1101. Counsel maintained there was no evidence Ly had been robbed, in that a key was found near his head and no other property had been taken. The trial court overruled each of defendant's objections and ruled the evidence of defendant's prior robberies and assaults admissible on the issue of intent. The trial court also overruled counsel's additional objections under Evidence Code section 352 that the prior robberies were remote in time and that defendant committed those offenses when he was a juvenile.

On appeal, defendant renews his argument that the evidence of the uncharged robberies should have been excluded under Evidence Code section 1101, subdivision (b), because the prosecution presented no evidence that he attempted to rob Ly during the course of murdering him, and in any event the evidence should have been excluded as more prejudicial than probative under Evidence Code section 352. He asserts the admission of the evidence violated his state and federal constitutional rights to due process, a fair trial, and a reliable penalty determination.

Evidence Code section 1101, subdivision (a) generally prohibits the admission of evidence of a prior criminal act against a criminal defendant "when offered to prove his or her conduct on a specified occasion." Subdivision (b) of that section, however, provides that such evidence is admissible when relevant to prove some fact in issue, such as motive, intent, knowledge, identity, or the existence of a common design or plan.

"The admissibility of other crimes evidence depends on (1) the materiality of the facts sought to be proved, (2) the tendency of the uncharged crimes to prove those facts, and (3) the existence of any rule or policy requiring exclusion of the evidence." (*People v. Carpenter* (1997) 15 Cal.4th 312, 378–379 [63 Cal.Rptr.2d 1, 935 P.2d 708].) Evidence may be excluded under Evidence Code section 352 if its probative value is "substantially outweighed by the probability that its admission would create substantial danger of undue

prejudice, of confusing the issues, or of misleading the jury." (*People v. Harrison* (2005) 35 Cal.4th 208, 229 [25 Cal.Rptr.3d 224, 106 P.3d 895].) "Because substantial prejudice is inherent in the case of uncharged offenses, such evidence is admissible only if it has substantial probative value." (*People v. Kelly* (2007) 42 Cal.4th 763, 783 [68 Cal.Rptr.3d 531, 171 P.3d 548].)

We have considered specific circumstances under which evidence of uncharged crimes may be admitted under subdivision (b) of Evidence Code section 1101. When the prosecution seeks to prove the defendant's identity as the perpetrator of the charged offense with evidence he had committed uncharged offenses, the admissibility of evidence of the uncharged offenses turns on proof that the charged and uncharged offenses share sufficient distinctive common features to raise an inference of identity. A lesser degree of similarity is required to establish the existence of a common plan or scheme and still less similarity is required to establish intent. (*People v. Roldan* (2005) 35 Cal.4th 646, 705 [27 Cal.Rptr.3d 360, 110 P.3d 289]; *People v. Ewoldt* (1994) 7 Cal.4th 380, 402–403 [27 Cal.Rptr.2d 646, 867 P.2d 757].) In order to be admissible to prove intent, the uncharged misconduct must be sufficiently similar to the charged offense to support the inference that the defendant probably acted with the same intent in each instance. (*People v. Kelly, supra,* 42 Cal.4th at p. 783; *People v. Ewoldt, supra,* 7 Cal.4th at p. 402.) The decision whether to admit other crimes evidence rests within the discretion of the trial court. (*People v. Kelly, supra,* 42 Cal.4th at p. 783.)

By pleading not guilty, defendant placed all the elements of the murder as well as the attempted robbery and hate-murder special-circumstances allegations in dispute at trial. (*People v. Roldan, supra,* 35 Cal.4th at pp. 705–706.) On the issue of intent, defendant declined to stipulate that he intended to permanently deprive Ly of his property. Accordingly, defendant's intent when he murdered Ly was a material fact.

Citing *People v. Ewoldt, supra,* 7 Cal.4th 380, and *People v. Guerrero* (1976) 16 Cal.3d 719 [129 Cal.Rptr. 166, 548 P.2d 366], defendant first contends that because there was no independent evidence that he attempted to rob Ly, the evidence of the uncharged robberies was erroneously admitted on the issue of intent. In *Guerrero,* this court relied on the absence of any independent evidence of actual or attempted sexual activity between the defendant and the victim to hold that evidence of a prior rape was inadmissible to establish that the charged murder was committed during the course of an attempted rape, i.e., to show the defendant's intent to engage in sexual activity with the victim. (*People v. Guerrero, supra,* 16 Cal.3d at pp. 727–728.) "In short, the People may not conjure up an attempted rape in

this instance in order to introduce evidence of another rape." (*Id.* at p. 728.) In *Ewoldt*, we stated that when proving a defendant's intent with evidence of uncharged crimes, the act alleged is " 'conceded or assumed,' " leaving only the question of " 'the state of mind that accompanied it.' " (*People v. Ewoldt, supra,* 7 Cal.4th at p. 394, fn. 2.) Here, defendant concedes the prosecution proved he murdered Ly but insists there was no evidence he attempted to rob him. Not so.

■ "Robbery is the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear." (§ 211.) "An attempted robbery requires a specific intent to commit robbery and a direct, ineffectual act (beyond mere preparation) toward its commission." (*People v. Medina* (2007) 41 Cal.4th 685, 694 [61 Cal.Rptr.3d 677, 161 P.3d 187].)

Defendant's admissions in the February 23d letter to Dulaney establish he committed acts that tended to show he attempted to rob Ly: defendant admitted he walked up to Ly at the tennis courts and Ly "was scared"; defendant hit Ly, causing him to fall to the ground; Ly told defendant that he could have whatever he wanted but that he had only a key; defendant asked Ly if he had a car; and when Ly said he had none, defendant put his knife to his throat and asked him again whether he had a car. Thus, evidence of the prior robberies was logically probative of whether, in hitting and knocking Ly to the ground and demanding to know if Ly had a car, defendant intended to rob him.

The evidence of defendant's involvement in the Reyes-Martinez and Tillman robberies tends to prove this material fact. Defendant's attack on Ly in this case shares numerous distinctive common features with those robberies. Defendant brought a companion to assist him in each crime: Christopher assisted defendant in the attack on Ly, and Harp and Ellis aided defendant in the prior robberies of Reyes-Martinez and Tillman, respectively. In each crime, defendant assaulted his victims and was the aggressor of the two assailants: Defendant knocked Ly to the ground before demanding to know if Ly had a car and put a knife to Ly's throat when he said he had none; defendant hit, chased, and kicked Reyes-Martinez before he and Harp stole the victim's money; and defendant punched the elderly Tillman in the face as he and Ellis left her home after stealing her money. Defendant did not know any of the victims. Each victim was vulnerable (alone, elderly, or outnumbered), did not fight back, and was assaulted whether or not he or she cooperated.

Defendant argues for the first time on appeal that the trial court should have excluded any reference that defendant assaulted Reyes-Martinez and

Tillman during the commission of the uncharged robberies because evidence of the assaults had "virtually no probative value" on the issue of whether he killed Ly during an attempted robbery. Because he failed to request that the trial court sanitize the evidence of the prior uncharged robberies by excluding references to the assaults, however, he cannot raise this issue for the first time on appeal. (*People v. Elliot* (2005) 37 Cal.4th 453, 472 [35 Cal.Rptr.3d 759, 122 P.3d 968]; Evid. Code, § 353, subd. (a) [a judgment shall not be reversed because of the erroneous admission of evidence unless there was a timely objection "so stated as to make clear the specific ground of the objection"].)

Even were we to assume that defendant properly preserved this issue, we would reject his contention. Defendant's brutal acts of violence towards the victims in the Reyes-Martinez and Tillman robberies were part and parcel of those robberies and, as stated above, shared substantial similarities with his conduct towards Ly in this case. Further, contrary to defendant's protests that his act of punching the elderly victim's face in the Tillman robbery was gratuitous and "unconnected" to the robbery, defendant's admission that he punched Tillman because he was fearful she might escape was evidence of the "force or fear" element of the robbery. (See *People v. Hill* (1998) 17 Cal.4th 800, 850 [72 Cal.Rptr.2d 656, 952 P.2d 673] [the force or fear element of robbery is satisfied if the perpetrator uses force to retain or escape with the property].) Under the totality of the circumstances, evidence of defendant's uncharged robberies of Reyes-Martinez and Tillman, including evidence he assaulted each victim during the commission of those crimes, reasonably could assist the jurors in determining whether defendant assaulted Ly in an attempt to rob him. Thus, the evidence was probative of defendant's intent to rob. The trial court did not abuse its discretion in admitting evidence of these uncharged crimes.

We also conclude the trial court acted within its discretion under Evidence Code section 352 in finding the probative value of the evidence of the uncharged robberies was not substantially outweighed by the potential for undue prejudice. As explained, the evidence had substantial probative value with respect to whether defendant intended to rob Ly at the time of the murder. The trial court instructed the prosecutor to keep this evidence brief so that it would be neither cumulative nor excessive. Based on our review of the record, we are satisfied the prosecution's presentation of this evidence complied with the court's directive. Moreover, none of the uncharged conduct was particularly inflammatory compared to the manner in which defendant brutally murdered Ly by stomping on his head, repeatedly stabbing him, and slicing the veins in his neck. (*People v. Ewoldt, supra*, 7 Cal.4th at p. 405.) Further, the trial court's instructions to the jury under CALJIC No. 2.09, regarding evidence admitted for a limited purpose, and CALJIC No. 2.50, advising it to consider such evidence not to prove defendant's predisposition to commit crimes but rather to determine whether the necessary element of

intent to rob was proven, eliminated any danger "of confusing the issues, or of misleading the jury." (Evid. Code, § 352.) We presume the jury followed these instructions. (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 107 [17 Cal.Rptr.3d 710, 96 P.3d 30].)

█ We reject defendant's contention that the admission of the uncharged robberies violated his constitutional rights to due process, a fair trial, and a reliable adjudication at all stages of a capital trial. We have long observed that "[a]pplication of the ordinary rules of evidence generally does not impermissibly infringe on a capital defendant's constitutional rights." (*People v. Kraft* (2000) 23 Cal.4th 978, 1035 [99 Cal.Rptr.2d 1, 5 P.3d 68].) Defendant fails to persuade us his case presents an exception to this general rule.

Finally, assuming for the sake of argument that the trial court abused its discretion in admitting evidence of defendant's prior crimes, reversal is not required. Even if the other crimes evidence had been excluded, defendant's admissions in his February 23d letter to Dulaney, including his numerous references to "2/11," which defendant admitted referred to armed robbery, provided compelling evidence defendant intended to rob Ly. (See pt. II.B., *post.*) Accordingly, a result more favorable to defendant was not reasonably probable absent admission of the prior crimes evidence. (*People v. Welch* (1999) 20 Cal.4th 701, 750 [85 Cal.Rptr.2d 203, 976 P.2d 754]; *People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].) For the same reasons, any error was harmless beyond a reasonable doubt. (See *Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 87 S.Ct. 824]; *People v. Cole* (2004) 33 Cal.4th 1158, 1195 [17 Cal.Rptr.3d 532, 95 P.3d 811].)

B. *Sufficiency of Evidence of First Degree Felony Murder and the Robbery Special Circumstance*

Defendant concedes sufficient evidence establishes he murdered Ly and intended to kill Ly from the moment "he hit him and knocked him to the ground." He contends, however, the evidence was insufficient to prove first degree murder on an attempted robbery-felony-murder theory because the prosecution failed to prove that he attempted to rob Ly. Even assuming there was sufficient evidence he attempted to rob Ly, defendant contends the evidence was nonetheless insufficient to support the special circumstance finding that he murdered Ly during the attempted commission of a robbery because any intent to steal was incidental to the murder. The insufficiency of the evidence, he claims, violated his rights to due process, a fair trial, and a reliable penalty determination under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and sections 1, 7, 12, 15, 16 and 17 of article I of the California Constitution.

When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (*People v. Valdez* (2004) 32 Cal.4th 73, 104 [8 Cal.Rptr.3d 271, 82 P.3d 296].) When reviewing the sufficiency of evidence to support a special circumstance, the relevant inquiry is " 'whether, after viewing the evidence in the light most favorable to the People, *any* rational trier of fact could have found the essential elements of the allegation beyond a reasonable doubt.' " (*People v. Alvarez* (1996) 14 Cal.4th 155, 225 [58 Cal.Rptr.2d 385, 926 P.2d 365], quoting *People v. Mickey* (1991) 54 Cal.3d 612, 678 [286 Cal.Rptr. 801, 818 P.2d 84].) We presume in support of the judgment the existence of every fact the trier of fact reasonably could infer from the evidence. (*People v. Ramirez* (2006) 39 Cal.4th 398, 463 [46 Cal.Rptr.3d 677, 139 P.3d 64].) If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. (*People v. Valdez, supra*, 32 Cal.4th at p. 104.) A reviewing court neither reweighs evidence nor reevaluates a witness's credibility. (*People v. Guerra* (2006) 37 Cal.4th 1067, 1129 [40 Cal.Rptr.3d 118, 129 P.3d 321].)

■ As discussed above, to be convicted of attempted robbery, the perpetrator must harbor a specific intent to commit robbery and commit a direct but ineffectual act toward the commission of the crime. (*People v. Medina, supra*, 41 Cal.4th at p. 694.) The jury may infer a defendant's specific intent to commit a crime from all of the facts and circumstances shown by the evidence. (See *People v. Bloom* (1989) 48 Cal.3d 1194, 1208 [259 Cal.Rptr. 669, 774 P.2d 698] ["Evidence of a defendant's state of mind is almost inevitably circumstantial, but circumstantial evidence is as sufficient as direct evidence to support a conviction."].)

■ Under the felony-murder rule, a murder "committed in the perpetration of, or attempt to perpetrate" one of several enumerated felonies, including robbery, is first degree murder. (§ 189.) The robbery-murder special circumstance applies to a murder "committed while the defendant was engaged in . . . the commission of, [or] attempted commission of" robbery. (§ 190.2, subd. (a)(17)(A).) "[T]o prove a felony-murder special-circumstance allegation, the prosecution must show that the defendant had an independent purpose for the commission of the felony, that is, the commission of the felony was not merely incidental to an intended murder." (*People v. Mendoza* (2000) 24 Cal.4th 130, 182 [99 Cal.Rptr.2d 485, 6 P.3d 150]; see also *People v. Green* (1980) 27 Cal.3d 1, 61–62 [164 Cal.Rptr. 1, 609 P.2d 468], overruled on other grounds in *People v. Hall* (1986) 41 Cal.3d 826, 834, fn. 3 [226

Cal.Rptr. 112, 718 P.2d 99].) To prove a robbery-murder special circumstance, the prosecution must prove the defendant formed the intent to steal before or while killing the victim. (*People v. Valdez, supra*, 32 Cal.4th at p. 105.)

The prosecution theorized that defendant approached Ly and attempted to rob him before savagely stabbing him to death because he was Vietnamese. Relying on *People v. Morris* (1988) 46 Cal.3d 1, 19 [249 Cal.Rptr. 119, 756 P.2d 843], overruled on other grounds in *In re Sassounian* (1995) 9 Cal.4th 535, 543–544, footnote 5 [37 Cal.Rptr.2d 446, 887 P.2d 527], and *People v. Green, supra*, 27 Cal.3d at pages 52–54, defendant initially argues that, at most, a theft or attempted theft occurred because he asked Ly, "Do you have a car?" only after he had already knocked Ly to the ground. To be clear, "a conviction of *robbery* cannot be sustained in the absence of evidence that the defendant conceived his intent to steal either before committing the act of force against the victim, or during the commission of that act; if the intent arose only after the use of force against the victim, the taking will at most constitute a theft." (*People v. Morris, supra*, 46 Cal.3d at p. 19, italics added, citing *People v. Green, supra*, 27 Cal.3d at pp. 52–54.) Defendant's argument fails, however, because it erroneously presumes proof of defendant's use of force against Ly is required to sustain the *attempted robbery*-felony-murder conviction. The crime of attempted robbery requires neither the commission of an element of robbery nor the completion of a theft or assault. (*People v. Medina, supra*, 41 Cal.4th at p. 694; see also *People v. Dillon* (1983) 34 Cal.3d 441, 454–455 [194 Cal.Rptr. 390, 668 P.2d 697].) In any event, as discussed below, defendant pressed his knife against Ly's throat *before* he asked a second time whether Ly had a car.

We conclude the record contains substantial evidence supporting the finding that defendant attempted to rob Ly, the attempted robbery-felony-murder conviction and the special circumstance finding that the murder occurred during the commission of an attempted robbery. Defendant's admissions in his February 23d letter to Dulaney established, in horrific detail, the circumstances of the attempted robbery and murder. The letter was handwritten and addressed to Dulaney ("Dear Bro, Ex-con 2/11, Rob") with a large drawing of the characters 2/11, prominently appearing in the top margin. Defendant described to Dulaney how he and Christopher approached Ly as he Rollerbladed alone on the Tustin High School tennis courts. Defendant saw that Ly "was scared" and used a ruse whereby defendant indicated to Ly that he thought he knew Ly in order to have Ly think "he wasn't gona get jumped." Defendant then hit Ly, knocking him to the ground. Ly responded, " 'what the fuck' and 'you can have what ever I got.' I have nothing only a key—you can have it.' " (Errors in original.) Defendant then asked Ly if he had a car and pulled out his knife. After Ly said, "No," defendant pressed his knife against Ly's throat, and again asked Ly if he had a car. Ly grabbed

defendant's hand that held the knife and looked at him. Because defendant thought Ly was trying to get his description, defendant stomped on his head three times and each time told Ly to stop looking at him. Defendant then repeatedly and fatally stabbed Ly with his knife.

Ly's body was discovered on the tennis courts the next morning. Near the body, the police found a hat and a single key that fit the locks at Ly's residence. The prosecution also introduced evidence of the Reyes-Martinez and Tillman robberies on the issue of defendant's intent during his assault of Ly.

Based upon this evidence, the jury reasonably could have found that defendant harbored an intent to steal Ly's property when he knocked Ly to the ground, demanded to know whether he had a car, and put his knife to his throat before asking him again whether he had a car. (See *People v. Rodrigues* (1994) 8 Cal.4th 1060, 1129 [36 Cal.Rptr.2d 235, 885 P.2d 1] [rejecting the defendant's contention that the accomplice's "unadorned question—'where do you have it?,' " did not reflect an intent to steal the victims' property].) Defendant's own observation that Ly "was scared" before he knocked him to the ground, and Ly's statement to defendant that he could take Ly's (house) key before defendant first asked him whether he had a car, strongly suggest that defendant, accompanied by Christopher, initially approached Ly in a manner that communicated nonverbally this intent to steal. Further, defendant's reference to "2/11" at the top of his confessional letter to Dulaney, a term that defendant admitted meant armed robbery, and evidence he previously assaulted and robbed Reyes-Martinez and Tillman of their money justified the jury's implied finding that defendant intended to permanently deprive Ly of his property.

Defendant argues the evidence was insufficient to support a finding that he intended to *permanently* deprive Ly of his property, citing *People v. Thompson* (1980) 27 Cal.3d 303, 321 [165 Cal.Rptr. 289, 611 P.2d 883]. In *Thompson*, this court held evidence that the defendant demanded and took the car belonging to the victim of the uncharged robbery was inadmissible to prove his specific intent to steal a car from the victim of the charged robbery. (*People v. Thompson, supra*, 27 Cal.3d at pp. 320–321.) Because the evidence of the uncharged robbery established that the defendant intended only to *temporarily* use the car, which was recovered by police shortly after it was taken, we reasoned this evidence did not tend to prove the defendant's intent to *permanently* deprive the victim of her car in the charged robbery. (*Ibid.*) Here, unlike *Thompson*, the evidence of the Reyes-Martinez and Tillman robberies established that defendant intended to *permanently* deprive his victims of their money. This evidence, in turn, reasonably supports an inference that defendant intended to *permanently* rob Ly of his property.

Defendant further contends the evidence is insufficient to prove he attempted to rob Ly because he did not take any property from Ly, such as his Rollerblades. To find an attempted robbery, however, the jury was not required to find that Ly possessed, or defendant took, anything of value. (*People v. Lee* (1932) 125 Cal.App. 709, 712 [13 P.2d 943].) Under general attempt principles, a completed theft is not required for attempted robbery. (*People v. Medina, supra,* 41 Cal.4th at p. 694; see also *People v. Dillon, supra,* 34 Cal.3d at pp. 454–455 [proof of an attempted crime does not require proof of an actual element of the offense attempted].) We conclude sufficient evidence supports the jury's implicit finding that defendant attempted to rob Ly. (See *People v. Rodrigues, supra,* 8 Cal.4th at p. 1129 [the totality of the circumstances justified the jury's finding that an attempted robbery and burglary occurred and that the defendant and his accomplices acted jointly to rob the victims].)

Defendant additionally argues that, even if the record contains sufficient evidence to support an implied finding that he attempted to rob Ly, the evidence nonetheless was insufficient to establish that the murder was committed during the commission of an attempted robbery. Defendant argues any attempted robbery was incidental to the murder, that is, any intent to rob Ly was incidental to his primary intent to kill Ly.

Defendant cites *People v. Morris, supra,* 46 Cal.3d 1, overruled on another ground in *In re Sassounian, supra,* 9 Cal.4th at pages 543–544, footnote 5, and *People v. Thompson, supra,* 27 Cal.3d 303, in support. In *People v. Morris,* the victim was fatally shot at close range in a public bathhouse while wearing only socks and shoes. The only witness to the shooting observed defendant standing in the doorway of the restroom, facing and firing inside, and then fleeing the scene. After the murder, the defendant attempted to use a credit card belonging to the victim. The defendant had admitted to an acquaintance that he had "been making money off 'dates' with homosexuals" and had killed one. The only reason defendant provided for the killing was " 'he had to kill one.' " (*People v. Morris, supra,* 46 Cal.3d at p. 11.)

We held this evidence was insufficient to sustain the robbery conviction or the robbery-murder special-circumstance finding because the evidence was insufficient to prove the victim had been robbed—"the record contain[ed] no evidence that any personal property was in the victim's possession at the time of the murder . . . ." (*People v. Morris, supra,* 46 Cal.3d at p. 20.) The defendant's admission to his acquaintance suggested he may have gone to the bathhouse to engage in prostitution and committed murder, but it did not support a reasonable inference that the defendant committed a robbery. (*Id.* at pp. 21–22.) The prosecution, therefore, failed to prove beyond a reasonable doubt that the victim was murdered during the commission of a robbery. (*Id.* at p. 22.)

In *People v. Thompson, supra,* 27 Cal.3d 303, the defendant entered the residence of a man and a woman and demanded money at gunpoint. The victims produced money and jewelry, but the defendant said that he did not want them. The defendant motioned to the victims to go downstairs, ordered them to sit, and demanded and obtained the man's car keys. (*Id.* at pp. 310–311.) The defendant then said to the woman, " 'You know why I'm here and you know who sent me,' " and shot the victims, killing the man. (*Id.* at p. 311.) The victims' car "was never moved and the car keys were dropped in a park" near the victims' residence. (*Ibid.*)

We held the evidence was insufficient to establish the defendant had an intent to steal independent of his intent to kill and set aside the special circumstance findings that the murder occurred during the commission of a robbery and burglary. The defendant's refusal to accept the victims' valuables and his statement to the victims just before shooting them showed his primary intent was to kill them, with property gain a secondary goal. (*People v. Thompson, supra,* 27 Cal.3d at p. 323.) Moreover, the defendant's demand for the victims' car keys immediately before the shootings, viewed in context, evinced his desire to use the car to effectuate his getaway from the shootings he intended. (*Id.* at p. 324.) Because the prosecution's evidence established "at most a suspicion" that the defendant harbored an intent to steal independent of his intent to kill, it precluded a determination of guilt beyond a reasonable doubt that the defendant committed the murder to advance an independent felonious purpose of stealing the car keys. (*Ibid.*)

The present case is distinguishable from both *Morris* and *Thompson.* As discussed above, defendant's detailed admissions in his February 23d letter to Dulaney established his intent to rob and kill Ly. Hence, there is no ambiguity in the record, as in *Morris,* about whether an attempted robbery occurred, and ample evidence supports the jury's implied findings that defendant attempted to rob Ly and killed him during the commission of that attempted robbery.

Unlike in *Thompson,* moreover, no evidence compelled a finding that defendant attempted to rob Ly in order to facilitate or conceal the murder. Defendant's February 23d letter to Dulaney, in which he admitted he twice demanded to know if Ly had a car and threatened Ly with a knife before he stomped on his head and stabbed him to death, shows he intended to rob Ly but then abandoned his plan when Ly said he had no car to steal. In addition, a rational jury could infer that defendant harbored an intent to rob Ly independent of his intent to kill Ly based on his multiple references to "2/11" in the February 23d letter, his admission during his police interview that "2/11" meant "armed robbery," Dulaney's testimony that he and defendant used that term to mean armed robbery, and the evidence that defendant

previously had robbed Reyes-Martinez and Tillman. The evidence therefore fully supports the conclusion that defendant's attempted robbery of Ly served an independent purpose and was not merely incidental to Ly's murder. (See *People v. Carter* (2005) 36 Cal.4th 1215, 1261 [32 Cal.Rptr.3d 838, 117 P.3d 544] [evidence that the defendant obtained the murder victim's bank account password before fatally strangling her supported the inference that the defendant harbored an intent to rob the victim independent of his intent to kill her].)

Although not argued during closing argument by the prosecutor, an additional basis for concluding the murder was committed during the commission of an attempted robbery appears on the record. Defendant admitted in the February 23d letter that while he held a knife to Ly's throat and demanded to know if he had a car, he became worried that Ly was trying to get a description of him. Defendant stomped on his head, told him to stop looking at him, and then brutally stabbed him to death. While in custody awaiting trial in this case, defendant wrote a letter to Samantha Roby, in which he recounted that after knocking Ly to the ground, "we waited for him to get up. When he did he layed [*sic*] there, and was looking at me. I was already on the run from Mt. Vernon shooting some people with a shot gun. So I thought he was trying to get a discription [*sic*] of me, so I stomped on his head, then stabbed him over 51 times, and slashing [*sic*] his neck." Defendant did not otherwise explain his statements about being "on the run" for shooting people, and no evidence that defendant assaulted individuals by shooting at them was presented during the guilt phase.[9] In any event, based on defendant's concession that he killed Ly to eliminate him as a witness and the trial court's instruction to the jury under CALJIC No. 8.81.17[10], the jury reasonably could conclude the murder was committed during the commission of a

---

[9] During the penalty phase, the prosecution presented evidence that defendant had previously assaulted several individuals by shooting at them with either a shotgun or BB gun. (See pts. I.C.1., I.C.3., *ante*.)

[10] The trial court instructed the jury under modified CALJIC No. 8.81.17, as follows: "To find that a special circumstance referred to in these instructions as murder in the commission of a robbery or attempted robbery is true, it must be proved that the murder was committed while the defendant was engaged in the commission of a robbery or attempted robbery. [¶] However, the special circumstance referred to in these instructions is not established if the robbery or attempted robbery was merely incidental to the commission of the murder. A robbery or attempted robbery is merely incidental to a murder where there is no purpose for the commission of the robbery or attempted robbery that is independent of the murder. [¶] For example, if the sole objective of the robbery or attempted robbery was to facilitate an escape or avoid detection after the murder, the robbery or attempted robbery would be merely incidental to the murder. [¶] On the other hand, if there was an intent at the time of the murder to commit a robbery that was not merely incidental to the murder, and the murder was committed while the defendant was engaged in the commission of a robbery or attempted robbery, the special circumstance is established regardless of whether the defendant also intended to kill the victim for some reason unrelated to the commission of the robbery or attempted robbery."

robbery and the robbery was not merely incidental to the murder. (See *People v. DePriest* (2007) 42 Cal.4th 1, 46–48 [63 Cal.Rptr.3d 896, 163 P.3d 896]; *People v. Gurule* (2002) 28 Cal.4th 557, 628–629 [123 Cal.Rptr.2d 345, 51 P.3d 224].)

█ Finally, that defendant intended both to forcibly steal from Ly and to kill him because of his race does not alter our conclusion. " 'Concurrent intent to kill and to commit an independent felony will support a felony-murder special circumstance.' " (*People v. Bolden* (2002) 29 Cal.4th 515, 554 [127 Cal.Rptr.2d 802, 58 P.3d 931], quoting *People v. Raley* (1992) 2 Cal.4th 870, 903 [8 Cal.Rptr.2d 678, 830 P.2d 712].) We therefore conclude substantial evidence supports the jury's special circumstance finding that the murder was committed during the commission of an attempted robbery.

### C. Assertedly Misleading Instruction on Evidence of Other Crimes (CALJIC Nos. 2.50, 2.50.1, and 2.50.2)

At the conclusion of the guilt phase, the trial court instructed the jury regarding other crimes evidence as follows: "Evidence has been introduced for the purpose of showing that the defendant committed crimes other than that for which he is on trial. The evidence, if believed, may not be considered by you to prove that the defendant is a person of bad character, or that he has a disposition to commit crimes. *It may be considered by you only for the limited purpose of determining if it tends to show:* [¶] *The existence of the intent which is a necessary element of the crime charged, or a motive for the commission of the crime charged.* For the limited purpose for which you may consider this evidence, you must weigh it in the same manner as you do all other evidence in the case. You are not permitted to consider this evidence for any other purpose.

"*Within the meaning of the preceding instructions, the prosecution has the burden of proof by a preponderance of the evidence that a defendant committed crimes other than that for which he is on trial.* You must not consider this evidence for any purpose unless you find by a preponderance of the evidence that a defendant committed the other crime. [¶] 'Preponderance of the evidence' means evidence that has more convincing force than that opposed to it. If the evidence is so evenly balanced that you are unable to find that the evidence on either side of an issue preponderates, your finding on that issue must be against the party who had the burden of proving it. You should consider all of the evidence bearing upon every issue regardless of who produced it." (CALJIC Nos. 2.50, 2.50.1 & 2.50.2 (6th ed. 1996), italics added.)

Defendant contends that the italicized portions of the above instructions rendered the instruction constitutionally infirm because it permitted the jury

to infer the existence of his intent to rob the victim based on proof by a preponderance of the evidence that he committed two uncharged robberies as a juvenile. As a result, he argues, the instructions as a whole reduced the prosecution's burden of proof in violation of his right to due process by allowing the jury to convict him of first degree robbery murder and find true the attempted robbery special circumstance allegation based in part on facts proven by a mere preponderance of the evidence.[11]

Defendant relies primarily on the decision of the Ninth Circuit Court of Appeals in *Gibson v. Ortiz* (9th Cir. 2004) 387 F.3d 812. There, jurors were instructed regarding propensity evidence under CALJIC No. 2.50.01 (6th ed. 1996) (Evidence of Other Sexual Offenses) in relevant part, as follows: " 'Evidence has been introduced for the purpose of showing that the defendant engaged in a sexual offense on one or more occasions other than that charged in the case . . . . [¶] *If you find that the defendant committed a prior sexual offense, you may, but are not required to, infer that the defendant had a disposition to commit the same or similar type sexual offenses. If you find that the defendant had this disposition, you may, but are not required to, infer that he was likely to commit and did commit the crime or crimes of which he is accused.* [¶] Unless you are otherwise instructed, you must not consider this evidence for any other purpose.' " (*Gibson v. Ortiz, supra,* 387 F.3d at p. 817, italics added.) This instruction was followed by a modified version of CALJIC No. 2.50.1: " 'Within the meaning of the preceding instructions, the prosecution has the burden of proving by a preponderance of the evidence that a defendant committed sexual offenses and/or domestic violence other than those for which he is on trial. [¶] You must not consider this evidence for any purpose unless you find by a preponderance of the evidence that a defendant committed the other sexual offenses and/or domestic violence.' " (*Gibson v. Ortiz, supra,* 387 F.3d at pp. 817–818.) The reasonable doubt standard was incorporated in other instructions given to the jury, including CALJIC No. 2.01 (Sufficiency of Circumstantial Evidence—Generally) and CALJIC No. 2.90 (Presumption of Innocence—Reasonable Doubt—Burden of Proof). (*Gibson v. Ortiz, supra,* 387 F.3d at pp. 821–823.)

Viewing the instructions as a whole, the court in *Gibson* held that the interplay of the above italicized portion of CALJIC No. 2.50.01 and CALJIC No. 2.50.1 unconstitutionally "allowed the jury to find that [the petitioner] committed the uncharged sexual offenses by a preponderance of the evidence and thus to infer that he had committed the *charged* acts based upon facts

---

[11] The People contend defendant forfeited these claims because he failed to challenge the instructions on these grounds at trial. Although defendant failed to object to the instructions at trial, we nonetheless address the merits of his contentions because the asserted instructional errors are reviewable on appeal to the extent they affect his substantial rights. (*People v. Prieto* (2003) 30 Cal.4th 226, 247 [133 Cal.Rptr.2d 18, 66 P.3d 1123]; § 1259.)

found not beyond a reasonable doubt, but by a preponderance of the evidence." (*Gibson v. Ortiz, supra*, 387 F.3d at p. 822.) The court specifically faulted the trial court for failing to offer an "explanation harmonizing the two burdens of proof discussed in the jury instructions." (*Id.* at p. 823.) The instructional error was deemed "structural error" requiring reversal under *Sullivan v. Louisiana* (1993) 508 U.S. 275 [124 L.Ed.2d 182, 113 S.Ct. 2078] because the jury was permitted to convict the petitioner based on a standard of proof below beyond a reasonable doubt. (*Gibson v. Ortiz, supra*, 387 F.3d at p. 825.)

*Gibson* is inapposite. Unlike CALJIC No. 2.50.01, given in *Gibson*, CALJIC No. 2.50, as given below, expressly prohibited jurors from considering other crimes evidence as "pro[of] that defendant is a person of bad character or that he has a disposition to commit crimes." Under this instruction, the jury could consider this evidence solely to determine whether defendant had "the intent which is a necessary element of the crime charged, or a motive for the commission of the crime charged." CALJIC No. 2.50 further explained that jurors had to weigh the other crimes evidence "in the same manner as you do all other evidence in the case" and were "not permitted to consider this evidence for any other purpose." That is, jurors were instructed that, regarding first degree robbery murder, "the specific intent to commit robbery and the commission or attempted commission of such crime must be proved beyond a reasonable doubt." (CALJIC No. 8.21.) The jurors were similarly instructed that the prosecution bore the burden of proving the robbery special circumstance allegation beyond a reasonable doubt. (CALJIC No. 8.80.1.) The trial court also gave the standard instructions on reasonable doubt and on the sufficiency of circumstantial evidence to prove guilt. (See *People v. Carpenter, supra*, 15 Cal.4th at p. 383 [rejecting a nearly identical claim, reasoning the trial court's standard instructions on reasonable doubt and on the sufficiency of circumstantial evidence to prove the necessary specific intent made clear the reasonable doubt standard applied to the intent element].) We find no reasonable likelihood that the instructions as a whole led the jury to believe that the prosecution was not required to prove all elements of first degree robbery murder and the attempted robbery special circumstance beyond a reasonable doubt. (*Estelle v. McGuire* (1991) 502 U.S. 62, 72 [116 L.Ed.2d 385, 112 S.Ct. 475]; *People v. Avena* (1996) 13 Cal.4th 394, 417 [53 Cal.Rptr.2d 301, 916 P.2d 1000]; *People v. Clair* (1992) 2 Cal.4th 629, 663 [7 Cal.Rptr.2d 564, 828 P.2d 705].)

This result is unaffected by the 1999 revision to CALJIC No. 2.50.1, which added the following cautionary language: "If you find other crime[s] were committed by a preponderance of the evidence, you are nevertheless cautioned and reminded that before a defendant can be found guilty of any crime charged [or any included crime] in this trial, the evidence as a whole must persuade you beyond a reasonable doubt that the defendant is guilty of that

crime." Nothing in the 1999 revision to CALJIC 2.50.1 implied or suggested the omission of such language rendered the prior version of the instruction infirm.

### D. *Sufficiency of Evidence of the Hate-murder Special Circumstance*

Defendant contends the evidence is insufficient to sustain the hate-murder special-circumstance finding that he murdered Ly because of Ly's race, color, religion, nationality, or country of origin (§ 190.2, subd. (a)(16)). He asserts this alleged insufficiency violates his constitutional rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and sections 1, 7, 12, 15, 16, and 17 of article I of the California Constitution.

#### 1. *Applicability of the Independent Standard of Review*

Preliminarily, defendant contends this court should employ the independent standard of review to assess whether sufficient evidence supports the hate-murder special-circumstance finding because, assertedly, First Amendment rights are implicated in this case.[12] Defendant claims the evidence of his writings, artwork, literature, and personal correspondence introduced by the prosecution to prove the hate-murder special-circumstance allegation constitutes free expression protected under the First Amendment.

In *Bose Corp. v. Consumers Union of U. S., Inc.* (1984) 466 U. S. 485, 499 [80 L.Ed.2d 502, 104 S.Ct. 1949], the United States Supreme Court explained that "in cases raising First Amendment issues . . . an appellate court has an obligation to 'make an independent examination of the whole record' in order to make sure that 'the judgment does not constitute a forbidden intrusion on the field of free expression.' " (Quoting *New York Times Co. v. Sullivan* (1964) 376 U.S. 254, 284–286 [11 L.Ed.2d 686, 84 S.Ct. 710].) "Independent review is not the equivalent of de novo review 'in which a reviewing court makes an original appraisal of all the evidence to decide whether or not it believes' the outcome should have been different. (*Bose, supra*, 466 U.S. at p. 514, fn. 31.) Because the trier of fact is in a superior position to observe the demeanor of witnesses, credibility determinations are not subject to independent review, nor are findings of fact that are not relevant to the First Amendment issue. (*Id.* at pp. 499–500; *Harte-Hanks [Communications v. Connaughton* (1989)] 491 U.S. [657,] 688 [105 L.Ed.2d 562, 109 S.Ct. 2678].) As noted above, under the substantial evidence standard, the question is whether any rational trier of fact could find the legal elements satisfied beyond a reasonable doubt,

---

[12] Respondent errs in asserting defendant forfeited this argument by failing to raise it at trial. "In every appeal, the threshold matter to be determined is the proper standard of review—the prism through which we view the issues presented to us." (*Lazar v. Hertz Corp.* (1999) 69 Cal.App.4th 1494, 1500 [82 Cal.Rptr.2d 368].)

whereas under independent review, an appellate court exercises its independent judgment to determine whether the facts satisfy the rule of law." (*In re George T.* (2004) 33 Cal.4th 620, 634 [16 Cal.Rptr.3d 61, 93 P.3d 1007].)

Relying on *Bose*, we held in *In re George T.*, that when a plausible First Amendment defense is raised, a reviewing court should independently review the entire record in determining the sufficiency of evidence supporting a juvenile court's finding that the minor made a criminal threat within the meaning of section 422. (*In re George T., supra*, 33 Cal.4th at pp. 631–634.) We explained that independent review of the constitutionally relevant facts is necessary in cases involving First Amendment issues "to ensure that a speaker's free speech rights have not been infringed by a trier of fact's determination that the communication at issue constitutes a criminal threat." (33 Cal.4th at p. 632.) Independent review is employed "precisely to make certain that what the government characterizes as speech falling within an unprotected class actually does so." (*Id.* at p. 633.)

Here, there is no such line to be drawn. California's hate-murder special circumstance, section 190.2, subdivision (a)(16), provides that the punishment for first degree murder is death or imprisonment for life without the possibility of parole when "[t]he victim was intentionally killed because of his or her race, color, religion, nationality, or country of origin." By its terms, this provision provides an enhanced penalty for first degree murder committed because of prohibited bias motivation and is not directed at free expression protected by the First Amendment. (See, e.g., *Wisconsin v. Mitchell* (1993) 508 U.S. 476, 485–490 [124 L.Ed.2d 436, 113 S.Ct. 2194] [enhancement statute is properly directed at conduct committed because of prohibited bias motivation and does not punish free speech in violation of the First Amendment]; *In re M.S.* (1995) 10 Cal.4th 698, 725 [42 Cal.Rptr.2d 355, 896 P.2d 1365] [§ 422.7, one of California's hate crime statutes, properly sanctions bias-motivated conduct and does not implicate a defendant's First Amendment rights].) Accordingly, because we conclude no First Amendment issues are implicated in this case, independent review of the evidence supporting the hate-murder special circumstance finding is not warranted.

### 2. *Substantial Evidence Supports the Hate-murder Special-circumstance Finding*

Applying the deferential substantial evidence test, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence from which a rational trier of fact could find the essential elements of the hate-murder special-circumstance allegation beyond a reasonable doubt. (*People v. Alvarez, supra*, 14 Cal.4th at p. 225.) We do not reweigh evidence or reassess a witness's credibility. (*People v. Guerra,*

*supra*, 37 Cal.4th at p. 1129.) Initially, we note that, contrary to these settled principles, defendant views the evidence in a light *unfavorable* to the judgment and, in effect, urges this court to reevaluate the credibility of certain witnesses.

Section 190.2, subdivision (a), provides that the penalty for a defendant found guilty of first degree murder is death or imprisonment for life without possibility of parole if the trier of fact finds one of the special circumstances enumerated under that provision. The hate-murder special circumstance applies if the trier of fact finds "[t]he victim was intentionally killed because of his or her race, color, religion, nationality, or country of origin." (§ 190.2, subd. (a)(16).)

The "because of" language in this statute is similar to the language of sections 422.6 and 422.7, the statutes at issue in *In re M.S., supra*, 10 Cal.4th 698, discussed above. We held that the phrase " 'because of' means the conduct must have been *caused by* the prohibited bias." (*Id.* at p. 719.) "A cause is a condition that logically must exist for a given result or consequence to occur." (*Ibid.*, citing American Heritage Dict. (2d ed. 1982) p. 249.) "[T]he bias motivation must be a cause in fact of the offense, whether or not other causes also exist. [Citation.] When multiple concurrent motives exist, the prohibited bias must be a substantial factor in bringing about the crime." (*In re M.S., supra*, 10 Cal.4th at p. 719; see also *People v. Superior Court (Aishman)* (1995) 10 Cal.4th 735, 741 [42 Cal.Rptr.2d 377, 896 P.2d 1387] [applying the reasoning on this point from *In re M.S.*, in interpreting similar language in § 422.75].)

In *People v. Sassounian* (1986) 182 Cal.App.3d 361 [226 Cal.Rptr. 880], the defendant was convicted of the first degree murder-assassination of the Consul General of the Republic of Turkey, and the jury found true the special circumstance allegation that he killed the victim because of his nationality or country of origin, in violation of section 190.2, subdivision (a)(16). (*Sassounian*, at p. 373.) The prosecution primarily relied on the testimony of a jail inmate who claimed the defendant confessed to him that he and others carried out the murder as "an act of revenge against the Turkish people for what they had done years before to the Armenians." (*Id.* at p. 385.) On appeal, noting it could not reweigh the evidence as the defendant urged, the Court of Appeal rejected the defendant's contention that the evidence was insufficient to sustain the jury's special circumstance finding on the ground the fellow inmate's testimony was inherently incredible. (*Id.* at p. 408.)

The defendant later sought habeas corpus relief on the ground the prosecution presented false evidence substantially material or probative on the issue of penalty, namely, the inmate's testimony that the defendant had confessed

to him. (*In re Sassounian, supra*, 9 Cal.4th at p. 547.) In rejecting this claim, this court held that, even without the inmate's testimony, overwhelming evidence—including the defendant's brother's statement to police regarding the defendant's anti-Turkish feelings and views—supported the reasonable inference that the defendant intentionally killed the victim because he "was Turkish *and represented Turkey*." (*Id.* at pp. 539, 548–549 & fn. 11.) That the defendant was motivated also by the latter circumstance would not affect the special circumstance finding because "[t]here is no requirement of an intentional killing '*solely* because of' the victim's 'nationality or country of origin.' " (*Id.* at p. 549, fn. 11.)

Defendant suggests that, in order to protect free speech, we should apply "with rigor" the substantial factor causation test set out in *In re M.S.* and require that the evidence establishing that a prohibited bias was a "substantial factor" in bringing about the murder *also* establish that the prohibited bias was "unequivocal, unconditional, immediate, and specific." Specifically, defendant argues that, in the context of the substantial factor analysis, the prosecution's evidence should establish: (1) defendant "possessed" racial bias; (2) defendant "specifically possessed a racial bias against members of the race to which the victim belonged"; (3) "this bias was significant in determining how [defendant] viewed the world and led his life"; and (4) "this bias explains why [defendant] murdered [the victim]."

Defendant's reliance on *In re M.S.* for such a proposition is misplaced. In *In re M.S.*, we rejected a contention that section 422.6, prohibiting certain conduct, including a threat of violence because of prohibited bias motive, was unconstitutionally overbroad under the First Amendment because it purportedly failed to require that the threat be unconditional, unequivocal, and imminent. (*In re M.S., supra*, 10 Cal.4th at pp. 711–712.) We construed section 422.6 to require proof of a present or apparent ability to carry out the threat and a specific intent to interfere with a person's right protected under state or federal law. (*In re M.S., supra*, 10 Cal.4th at pp. 712–713.) These requirements, we reasoned, help to safeguard against unconstitutional application to protected speech. (*Ibid.*)

 Here, there is no similar risk of unconstitutional application of the statute defining the hate-murder special circumstance to protected speech, as it applies only to conduct unprotected by the First Amendment: first degree murder committed because of prohibited bias motivation. (See *Wisconsin v. Mitchell, supra*, 508 U.S. at pp. 484, 487.) Further, we reiterate that the First Amendment does not prohibit evidentiary use of a defendant's protected expression to prove the elements of a crime. (*Wisconsin v. Mitchell, supra*, 508 U.S. at p. 489.) For these reasons, we decline to infer any requirement that proof a prohibited bias motivation was a "substantial factor" in causing

the hate-murder special-circumstance murder must also establish that the bias was unequivocal, unconditional, immediate, and specific.

Here, the jury reasonably could infer from the evidence that defendant, who is White, was a follower of the White supremacy movement and advocated racial hatred. Sergeant Miller's expert testimony on White supremacy beliefs and culture and the materials police seized from defendant's bedroom—defendant's Bible with references to a White supremacist leader and organization on the last several pages, written and published White supremacy materials, the derogatory "Martin Luther King" poster, a helmet adorned with a swastika, and a cardboard box adorned with the Nazi "SS" lightning bolts and swastikas—reasonably suggest defendant identified with White supremacists and was motivated to use violence to advance their belief that the White race is superior to all other races. He actively participated in the White supremacy movement. While in custody in Missouri in 1993, he bragged that he was running the White Aryan Resistance (W.A.R.) group in the prison and was using violence to support the national party. He encouraged Dulaney to start his own group but not to associate with any organization that did not "say violence or anything of that nature." Defendant also encouraged Dulaney to write to the Nationalist Party of Canada and request literature so that he and Dulaney could start their own party when he was released from custody. In 1995, defendant, Dulaney, and defendant's brother formed their own gang, the ICP, which became involved in the "White Power" movement.

Additional evidence showed defendant's particular racial animus against Asians. He admitted to Ellis that he disliked Asians, purportedly because he was forced to leave Okinawa, and referred to Asians as "gooks." Also, Lopez, who worked with defendant at Kmart, testified that within a couple of months of Ly's murder, defendant referred to Asian customers as "gooks."

In his February 23d letter to Dulaney, which Dulaney received approximately one month after Ly's murder, defendant boasted he "killed a jap [*sic*]." He provided Dulaney with the details of how he brutally stabbed Ly to death and then added that he was "having a ball in tustin wish you were here." During a telephone conversation with Dulaney on the day after Dulaney received defendant's confessional letter, defendant admitted he killed Ly "for racial movement." Defendant repeated that he "killed the Jap [*sic*]," and could not stop stabbing him. He described Ly's murder as giving him " 'a rush' " " 'like a high.' "

After defendant was arrested and jailed, he bragged to Villa, a fellow inmate, that he was in custody "for stabbing a Nip [*sic*] to death." Defendant also admitted to Villa that he told a friend "how easy it is to kill a Vietnamese

and get away with it." In his letter to Tammy Shoopman, defendant referred to Ly as a "Chino [who] got stabbed to Death" and bragged this earned him "a 187 . . . and Hate crime."

From these facts, a jury reasonably could infer that Ly was murdered because of his race or country of origin and that Ly's race or country of origin was a substantial factor motivating the killing, within the meaning of section 190.2, subdivision (a)(16). (See *In re M.S., supra,* 10 Cal.4th at p. 719; see also *People v. Sassounian, supra,* 182 Cal.App.3d at p. 408.) That the evidence also supports the jury's additional finding that defendant murdered Ly because he wanted to eliminate him as a witness to the attempted robbery (see pt. II.B., *ante*) does not invalidate the hate-murder special circumstance. (See *In re Sassounian, supra,* 9 Cal.4th at p. 549 & fn. 11.)

Accordingly, we conclude substantial evidence supports the jury's hate-murder special-circumstance finding.

### E. *Expert Testimony on the Subject of White Supremacy*

Defendant contends the trial court abused its discretion and denied him a fair trial by permitting Huntington Beach Police Department Sergeant Ronald Miller to testify as an expert on the subject of White supremacy and to opine that defendant was a White supremacist. Defendant asserts violations of his Fifth and Fourteenth Amendment rights to due process and the presumption of innocence absent proof of guilt beyond a reasonable doubt (*In re Winship* (1970) 397 U.S. 358 [25 L.Ed.2d 368, 90 S.Ct. 1068]) as well as the Eighth Amendment right to a reliable adjudication in a capital case (*Caldwell v. Mississippi* (1985) 472 U.S. 320 [86 L.Ed.2d 231, 105 S.Ct. 2633]).

#### 1. *Procedural and Factual Background*

Outside the presence of the jury, the trial court conducted an Evidence Code section 402 hearing to determine the admissibility of Sergeant Miller's testimony as expert testimony on the subject of White supremacy. The prosecutor intended to call the expert to (1) identify letters written by defendant and other material found in his possession as containing references to White supremacist groups and espousing White supremacist beliefs, (2) identify White supremacist groups and describe their beliefs, and (3) identify defendant as a White supremacist. Counsel for defendant objected to the proposed testimony on the grounds that the subject of White supremacy was within the jurors' common knowledge, the writings and symbols depicted in defendant's letters and other materials in his possession required no interpretation, and the testimony's prejudicial impact outweighed its probative value (Evid. Code, § 352).

Sergeant Miller testified at the section 402 hearing that, for over 10 years, he had been involved with White supremacists and one of their subgroups, "skinheads," as a police officer assigned to the Huntington Beach Police Department Beach Detail and Gang Unit. He had developed expertise on the subject of White supremacy through his contacts and interviews with self-proclaimed White supremacists and "skinheads" and his review of numerous publications on the White supremacist movement. During the course of this work, he became acquainted with numerous White supremacist groups that believed "the White race is supreme over others." Sergeant Miller had testified in court five times on the subject of White supremacy.

The trial court overruled defendant's objections and found Miller qualified as an expert on the subject of "White supremacist groups and their teachings and thinking."

Sergeant Miller then testified before the jury that a "White supremacist" is "a racist who is oriented toward the superiority of the White race, believing that it is above all others. They tend to view minorities as . . . sub-humans. [¶] They are also quite often Antisemitic, even to the point that they label the Holocaust as a Jewish trick to garner support and sympathy for the Jews throughout the world. [¶] Those are the two major tenets of the White supremacist."

Miller testified that he had reviewed the handwritten notations on the last several pages of the Bible recovered from defendant's apartment. He recognized the name of a White supremacy group, Church of Jesus Christ Christian, also known as the Aryan Nations. This group is based in Hayden Lake, Idaho, and is led by Richard Butler, who "appeals to a broad spectrum within the white supremacist movement, including skinheads, Ku Klux Klan members." Members of the Aryan Nations subscribe to the "Identity Christian" belief, described by Miller as a "pseudo religion" that uses biblical passages "to prove that White people are God's chosen, [and that] all others are what they would call mud people or sub human." This group believes all Jews are descendants of Satan.

Miller recognized a reference to "Brig. Gen. Jack Mohr," whom he identified as Brigadier General Jack Mohr, who had served as a colonel in the United States Army during World War II and had been a prisoner of war. Miller knew Mohr had been involved with preaching "Christian Identity" beliefs about White supremacy to prisoners. Miller believed Mohr "would probably have no problem with violence against minorities under the right circumstances."

Miller recognized a notation for The Talon, a newsletter of the White supremacist organization Euro-American Alliance, which is based in Milwaukee, Wisconsin. This group advocated that the White race should be "kept pure from any inbreeding, inter-mixing between, for example, Asians and White American[s] or black[s] and White Americans."

Sergeant Miller examined the inside of the box seized from defendant's apartment and observed it was covered with multicolored "personal graffiti," including the Nazi swastika (two) and the Nazi "SS" lightning bolts. He explained the "SS" lightning bolts symbol identified members of the "Stamp Shuffel [*sic*: Schutzstaffel]." The "SS" referred to "the elite Nazi organization assigned by Hitler with such missions as the extermination of the Jews, minorities, gypsies, homosexuals, communists and others during the holocaust of World War II." Miller examined a letter defendant had written to Jeremie Overstreet while he was in custody in this case and identified among its contents the Nazi "SS" lightning bolts symbol and the phrase, "Stay White," a reference to the belief that the White race should be kept "pure."

Miller next identified a piece of paper found in defendant's Bible with the heading "Pro White Organizations" as comprising a list of White supremacist organizations, including (1) the Aryan Research Fellowship, based in Coquille, Oregon, and identified by the United States Department of Justice as a White supremacist organization; (2) the N.A.A.W.P., or National Association for the Advancement of White People, based in New Orleans, Louisiana, and formed by former Ku Klux Klan (KKK) imperial wizard David Duke "to protect White people's rights"; (3) the New Order, based in Milwaukee, Wisconsin, and successor to the American Nazi Party; this group views Adolf Hitler as "the Messiah for the Aryan or White race" and formerly was known as the National Socialist White People's Party; (4) The Klansmen, a group associated with the KKK; (5) the White Aryan Resistance, based in Fallbrook, California, and led by White supremacist Tom Metzger, whom Miller described as "oriented toward violence"; (6) the White Knights, a "KKK-oriented" organization, based in Birmingham, Alabama; and (7) the Knights of the Ku Klux Klan, a larger faction of the KKK, led by Thom Robb, whom Miller described as a White supremacist and Christian Identity preacher.

Miller elaborated that, with the exception of skinheads, he had the most contact with Metzger and the White Aryan Resistance, an organization "very violent in [its] orientation." The White Aryan Resistance published a newsletter that "regularly feature[d] both articles [and] illustrations backing up [Metzger's] White supremacist views." One such featured illustration depicted "a White man with a double-barrel shotgun blasting a minority with a couple of rounds" with a caption stating, "If it isn't White, waste it." As for this organization's leader, Metzger advocated "White supremacy" over

Blacks, Asians, Hispanics, and all minorities. He maintained a Web site, and previously a computer bulletin board, that promoted his and the organization's "hate views." Earlier, Metzger had produced a cable access television program called *Race and Reason* that provided a forum for White supremacists to appear as guests and discuss their common beliefs about White supremacy. After Metzger began recruiting skinheads, the latter produced their own cable access program called *Skinhead Race and Reason.*

Sergeant Miller then examined portions of three letters defendant had written to Robert Dulaney over a year before the murder in this case. In a letter dated March 10, 1993, when defendant was incarcerated in Missouri, he wrote, "I run the W.A.R. group in here. White Arian resistance is a action group—were a branch of NVAP—National Vastal Arian Party they dictate we react in other words they talk—we back them with violence." (Errors in original.) Miller explained that the phrase "W.A.R. group" referred to the "White Aryan Resistance" and interpreted defendant's written statement as meaning that when the NVAP "talks," defendant's White Aryan Resistance group backs them up with violence.

In a letter postmarked October 12, 1993, defendant wrote, "Don't worry dog, I love to play in the WaR zone . . . ." Miller understood "WaR" as referring to the White Aryan Resistance supremacist organization. In another letter postmarked February 14, 1994, defendant wrote the word "Kill" in large block letters near the closing. The letter "K" resembled a Nazi swastika. Below this, defendant repeated the word "kill" seven times in lowercase letters.

Sergeant Miller examined a photograph of the helmet and plastic skull found in defendant's bedroom and identified the helmet as a World War II Nazi military helmet or a replica. A Nazi swastika symbol appeared on the front of the helmet.

Based on defendant's own words in his letters, the groups with whom defendant associated, and his use of the symbols associated with the "Nazi White supremacist types of beliefs," including the Nazi swastika and "SS" lightning bolts symbols, Miller believed defendant was a White supremacist. Among the letters Miller considered were two letters written by defendant while in custody awaiting trial in this case. One was addressed to Kelly Dresen, in which defendant stated, "I am 100 percent against black." In another letter addressed to Jeremie Overstreet, defendant drew two lightning bolts next to the phrase, "stay White," and wrote on a separate page, "No better not them hong kong fuee's might not like you!" (Errors in originals.)

## 2. *Discussion*

On appeal, defendant first claims the trial court erred by allowing Sergeant Miller to testify that written and printed material found in defendant's bedroom, including letters written by defendant before and after Ly's murder, referred to White supremacist organizations and espoused White supremacist beliefs. Defendant asserts that Miller's testimony should have been restricted to identifying the organizations listed in defendant's Bible or on the "Pro White Organizations" list, and that jurors were capable of recognizing and understanding any White supremacist references or overtones in the writings and printed material.

A trial court's decision to admit expert testimony is reviewed for abuse of discretion. (*People v. Prince* (2007) 40 Cal.4th 1179, 1222 [57 Cal.Rptr.3d 543, 156 P.3d 1015].) We conclude for the reasons discussed below that the trial court did not abuse its discretion by admitting this testimony.

First, although expert testimony is generally inadmissible on topics "so common" that jurors of ordinary knowledge and education could reach a conclusion as intelligently as the expert, an expert may testify on a subject about which jurors are not completely ignorant. (*People v. Prince, supra*, 40 Cal.4th at p. 1222, citing *People v. McDonald* (1984) 37 Cal.3d 351, 367 [208 Cal.Rptr. 236, 690 P.2d 709], overruled on another ground in *People v. Mendoza* (2000) 23 Cal.4th 896, 914 [98 Cal.Rptr.2d 431, 4 P.3d 265].) In determining the admissibility of expert testimony, "the pertinent question is whether, even if jurors have some knowledge of the subject matter, expert opinion testimony would assist the jury." (*People v. Prince, supra*, 40 Cal.4th at p. 1222; see Evid. Code, § 801, subd. (a).)

Here, the challenged evidence was relevant to establish defendant's state of mind at the time he killed Ly and whether defendant killed Ly because of his "race, color, religion, nationality, or country of origin." (§ 190.2, subd. (a)(16).) Although some jurors may have possessed general knowledge of the subject of White supremacy, Miller's testimony nonetheless explained in some detail that a White supremacist is a racist who believes the White race is superior to all other races and is anti-Semitic, "label[ing] the Holocaust as a Jewish trick to garner support and sympathy for the Jews throughout the world." Without the benefit of the expert's testimony, the jurors might not have understood that symbols often associated with Nazis that adorned some of the items found in defendant's bedroom (e.g., the Nazi swastikas and the "SS" lightning bolts on defendant's box) and phrases that were contained in defendant's letters and other written material (e.g., "Pure White Organizations," "Stay White," "I run the W.A.R.") were used by White supremacists to advocate their beliefs. Nor would the jurors likely have

recognized the names of the White supremacist leaders (e.g., Brigadier General Jack Mohr) and organizations (Church of Jesus Christ Christian, also known as the Aryan Nations) noted in the materials seized. Sergeant Miller's testimony could assist jurors by providing them with a basis of information about White supremacist beliefs and tenets from which they could determine, based on the material seized from defendant's bedroom, that defendant subscribed to White supremacist beliefs and tenets.

Ultimately, this evidence could assist the jury in determining defendant's motive for killing Ly. Thus, the expert's testimony demonstrated more than defendant's abstract beliefs about White supremacy and was relevant to the jury's determination of whether the prosecution proved the hate-murder special circumstance. (Cf. *Dawson v. Delaware* (1992) 503 U.S. 159, 164–165 [117 L.Ed.2d 309, 112 S.Ct. 1093] [evidence of the defendant's membership in Aryan Brotherhood that was not linked to the crime committed and revealed only the defendant's abstract beliefs was irrelevant to his capital sentencing hearing].) Under these circumstances, we cannot conclude Sergeant Miller's testimony was of no assistance to the jurors (Evid. Code, § 801, subd. (a)), or would contribute nothing to the jury's common fund of information. (*People v. Farnam* (2002) 28 Cal.4th 107, 163 [121 Cal.Rptr.2d 106, 47 P.3d 988].)

A second basis for upholding the trial court's decision admitting Miller's testimony on White supremacy culture and beliefs is that we have admitted expert testimony in analogous circumstances. (See, e.g., *People v. Gonzalez* (2006) 38 Cal.4th 932, 944–949 [44 Cal.Rptr.3d 237, 135 P.3d 649] [approving the admission of expert testimony regarding gang culture and witness intimidation by gang members]; *People v. Ochoa* (2001) 26 Cal.4th 398, 438 [110 Cal.Rptr.2d 324, 28 P.3d 78] [approving the admission of expert testimony to explain the significance of the defendant's gang-related tattoos]; *People v. Gardeley* (1996) 14 Cal.4th 605, 617 [59 Cal.Rptr.2d 356, 927 P.2d 713] [recognizing that "[t]he subject matter of the culture and habits of criminal street gangs" satisfies the criterion of admissible expert testimony under Evid. Code, § 801]; *People v. Champion* (1995) 9 Cal.4th 879, 922 [39 Cal.Rptr.2d 547, 891 P.2d 93] [approving admission of juvenile gang expert's testimony on defendants' gang membership as relevant to establish their identities as perpetrators of the charged offenses]; see also *People v. Olguin* (1994) 31 Cal.App.4th 1355, 1370 [37 Cal.Rptr.2d 596] ["The use of expert testimony in the area of gang sociology and psychology is well established."].)

Numerous decisions in federal and other state cases also have upheld the admission of expert testimony to explain the culture and beliefs of White supremacy groups and gangs and to interpret tattoos, symbols, and graffiti

associated with these groups when such evidence was relevant to the issues at trial. (See *U.S. v. Sparks* (8th Cir. 1991) 949 F.2d 1023, 1025–1026 [expert testimony explaining the meaning of gang graffiti and hand signs depicted in the photographs seized from house in which the defendant was arrested was properly admitted and relevant to establish the defendant's gang affiliation and for impeachment]; *U.S. v. Skillman* (9th Cir. 1990) 922 F.2d 1370, 1374 & fn. 4 [expert testimony describing "skinheads" as " 'a neo-Nazi type of group . . . [that] espouse[s] racial purity and White power, and . . . tend[s] to be violent' " was properly admitted because it tended to establish the defendant's "racial animus," an element of the charged offense, intimidating or interfering with a person's housing rights because of race or color]; *United States v. Mills* (11th Cir. 1983) 704 F.2d 1553, 1559–1560 [the trial court properly admitted the testimony of a "quasi expert" on the organization, history, and activities of the Aryan Brotherhood, a White supremacist prison gang, as relevant to the defendant's motive and the circumstances of the alleged Aryan Brotherhood contract killing]; *People v. Skinner* (Colo.Ct.App. 2002) 53 P.3d 720, 722, 724 [the trial court did not abuse its discretion by admitting expert testimony to explain that the defendant's tattoo could be viewed as a symbol of White supremacy beliefs]; *People v. Wagner* (2006) 27 A.D.3d 671, 672 [811 N.Y.S.2d 125, 126–127] [the trial court properly permitted an expert on hate crimes and the meaning of tattoos to testify with respect to the defendant's White supremacist tattoos; the tattoos were relevant to the defendant's motive and intent to commit second degree aggravated harassment]; *Mason v. State* (Tex.Crim.App. 1995) 905 S.W.2d 570, 577 [a prison gang expert's testimony that the Aryan Brotherhood is a White supremacist organization that, among other things, recruits White inmates and engages in contract killings and assaultive behavior was properly admitted as relevant to the issue of the defendant's future dangerousness]; *State v. Campbell* (1995) 78 Wn.App. 813, 823 [901 P.2d 1050, 1055–1056] [the trial court properly admitted the expert gang testimony to explain gang terminology, gang symbols, and the organizational structure and history of gangs as relevant to show the defendant's premeditation, intent, and motive to commit the murders].)

In addition, the United States Supreme Court has held that evidence of racial intolerance and subversive advocacy may properly be considered in a capital sentencing proceeding when such evidence is relevant to the issues involved. (*Dawson v. Delaware, supra*, 503 U.S. at p. 164.) The high court suggested that such evidence properly could be adduced by expert testimony. (*Id.* at pp. 165, 168.)

Defendant claims that Sergeant Miller's testimony that White supremacists "are also quite often Antisemitic, even to the point that they label the Holocaust as a Jewish trick to garner support and sympathy for the Jews throughout the world" was irrelevant and inadmissible because, he asserts, Ly

was not Jewish. As a preliminary matter, we agree with respondent that defendant forfeited this claim because, although defendant objected to the admission of the expert's testimony as a whole, he failed to object specifically on the ground he now advances and thereby deprived the trial court of an opportunity to make a fully informed ruling on the issue. (Evid. Code, § 353; see, e.g., *People v. Geier* (2007) 41 Cal.4th 555, 609–611 [61 Cal.Rptr.3d 580, 161 P.3d 104] [the defendant's broad pretrial objection to the admissibility of DNA evidence did not preserve for appeal his specific claim that the trial court erroneously permitted the DNA expert to testify to the frequency of the genetic profile among only a single racial group rather than for two additional major racial and ethnic groups for which DNA databases existed].) In any event, defendant's contention is without merit.

Sergeant Miller described the White supremacists' two tenets as their belief in the superiority of the White race above all other races and their particular hatred of Jews, who they believe fabricated the Holocaust to garner worldwide sympathy and support. The expert's comments regarding the White supremacists' hatred towards Jews were relevant to explain these tenets and their origins and to provide the jurors with a basis of information for understanding certain symbols found in defendant's bedroom (e.g., the "SS" lightning bolts) and determining whether defendant's murder of Ly was motivated by racial hatred. Whether or not Ly was Jewish, these comments were relevant on the general subject of White supremacy. Defendant's complaint concerns the weight of this portion of Miller's testimony, not its admissibility.

Defendant also claims that Sergeant Miller's testimony regarding Tom Metzger, whom Miller identified as the leader of the White Aryan Resistance, was irrelevant because Metzger was not on trial. According to Miller, however, the "Pro White Organizations" list found in defendant's Bible contained the name "White Aryan Resistance," the "very violent" organization led by Metzger. Defendant also referred to the White Aryan Resistance in letters he had written to Dulaney over one year before he killed Ly. In any event, the expert's remarks concerning Metzger gave the jurors an overview of White supremacy culture and beliefs in order to place in context the White supremacist references found in the seized material. This concern, too, affects the weight of this evidence, not its admissibility.

Next, defendant claims the trial court erred in permitting Sergeant Miller to give his opinion that defendant was a White supremacist, an issue properly reserved to the trier of fact. He asserts the expert was less informed than the jurors on this point because they could also consider additional relevant evidence on this point, including the testimony of other witnesses.

 Evidence Code section 805 provides that "[t]estimony in the form of an opinion that is otherwise admissible is not objectionable because it embraces the ultimate issue to be decided by the trier of fact." (See *People v. Prince, supra,* 40 Cal.4th at pp. 1226–1227 [an expert on crime scene analysis and "signature crimes" testified that all six murders were committed by the same person].) We cannot say that the trial court abused its discretion in finding Sergeant Miller's opinion that defendant was a White supremacist would be of assistance to the jury in evaluating the evidence and determining whether the prosecution had proved the charged offenses and the truth of special circumstance allegations. The expert stated no opinion as to defendant's guilt or the truth of the special circumstances. His opinion that defendant was a White supremacist did not bind the jurors on this point or preclude them from considering other relevant evidence. The trial court instructed the jurors that they were the "sole judges" of the credibility of a witness (CALJIC No. 2.20), that they should consider all the evidence on which the proof of any fact depends (CALJIC No. 2.27), and that they were free to determine the weight, if any, to accord an expert's opinion upon considering the basis for the opinion (CALJIC No. 2.80).

Defendant additionally contends that the probative value of Sergeant Miller's testimony was outweighed by its prejudicial effect (Evid. Code, § 352) and that its admission rendered his trial unfair in violation of his right to due process. He asserts the expert's opinion that he was a White supremacist unfairly poisoned the jury against him because it depicted him as an anti-Semite who wanted to exterminate Jews, minorities, homosexuals, and gypsies. This opinion, he claims, also equated him with Adolf Hitler and "the worst excesses of the Nazi regime." Defendant further complains that the expert's description of a photograph of "a White man with a double-barrel shotgun blasting a minority with a couple of rounds" in a White Aryan Resistance publication was prejudicial.

 Evidence Code section 352 permits a trial court in its discretion to exclude evidence if its probative value is substantially outweighed by the probability that its admission would create a substantial danger of undue prejudice. We review a trial court's decision whether to exclude evidence pursuant to Evidence Code section 352 for abuse of discretion. (*People v. Cox* (2003) 30 Cal.4th 916, 959 [135 Cal.Rptr.2d 272, 70 P.3d 277].) For this purpose, " 'prejudicial' means uniquely inflammatory without regard to relevance." (*People v. Zambrano* (2007) 41 Cal.4th 1082, 1138 [63 Cal.Rptr.3d 297, 163 P.3d 4].) "Evidence is substantially more prejudicial than probative [citation] if . . . it poses an intolerable 'risk to the fairness of the proceedings or the reliability of the outcome' [citation]." (*People v. Waidla* (2000) 22 Cal.4th 690, 724 [94 Cal.Rptr.2d 396, 996 P.2d 46].)

Here, the admission of Sergeant Miller's testimony was probative of defendant's motive and intent in committing the murder and, thus, was directly relevant to the jury's determination of the murder charge and hate-murder special-circumstance allegation. We do not view as prejudicial either the expert's general overview of the subject of White supremacy or his specific testimony that White supremacists harbor a particular hatred of Jews, associate with Nazis, and use Nazi-related symbols (e.g., "SS" lightning bolts and swastika) to promote their racist beliefs, and regularly feature racist illustrations in their publications (e.g., the depiction of a White man "blasting a minority" with a double-barrel shotgun). As defendant has argued, many of the items found in defendant's bedroom and the letters confiscated while he was in jail awaiting trial themselves clearly conveyed messages of racial hatred and anti-Semitism. For example, jurors reasonably could find defendant harbored a hatred of Blacks and Jews based on evidence he displayed in his bedroom the racist "Martin Luther King" poster, possessed an actual or a replica of a Nazi helmet with a swastika symbol across the front, and penned a letter to Dulaney before Ly's death that contained a swastika above the words "kill-kill-kill-kill-kill-kill-kill" followed by "Them all!" Evidence is not unduly prejudicial "merely because it strongly implicates a defendant and casts him or her in a bad light." (*People v. Robinson* (2005) 37 Cal.4th 592, 632 [36 Cal.Rptr.3d 760, 124 P.3d 363].) The trial court properly instructed the jury not to be influenced by passion, sympathy, or prejudice and to conscientiously consider and weigh the evidence in applying the law. Under these circumstances, where other, properly admitted evidence plainly communicated to the jury defendant's odious attitudes, the trial court properly found the probative value of the expert's testimony was not substantially outweighed by its prejudicial effect.

Finally, assuming without deciding that defendant's additional constitutional claims were preserved (see *People v. Partida* (2005) 37 Cal.4th 428, 433–434 [35 Cal.Rptr.3d 644, 122 P.3d 765]), they are without merit for the same reasons we have rejected defendant's state law claims. (See *People v. Prince, supra*, 40 Cal.4th at p. 1229; *People v. Kraft, supra*, 23 Cal.4th at p. 1035.)

III. Penalty Phase

A. *CALJIC No. 8.85*

Defendant contends that CALJIC No. 8.85,[13] which describes the aggravating and mitigating factors the jury may consider in determining penalty, is

---

[13] The trial court instructed the jury in the language of CALJIC No. 8.85, in relevant part, as follows: "In determining which penalty is to be imposed on defendant Gunner Jay Lindberg, you shall consider all of the evidence which has been received during any part of the trial in this case, except as you may [be] hereafter instructed. You shall consider, take into account the

constitutionally flawed because (1) the instruction fails to inform the jury which factors are mitigating and which factors are aggravating, and (2) the use of the modifiers "extreme" and "substantial" in the instruction acts as a barrier to the jury's consideration of mitigation.[14] We previously have rejected these challenges. (*People v. Ramirez, supra,* 39 Cal.4th at p. 469 ["instructions in the language of CALJIC No. 8.85 do not violate the Eighth and Fourteenth Amendments by failing to delete inapplicable sentencing factors or delineate between aggravating and mitigating circumstances"]; *People v. Perry* (2006) 38 Cal.4th 302, 319 [42 Cal.Rptr.3d 30, 132 P.3d 235] [the terms "extreme" and "substantial" do not unconstitutionally limit the mitigating factors the jury may consider]; see also *People v. San Nicolas* (2004) 34 Cal.4th 614, 675–676 [21 Cal.Rptr.3d 612, 101 P.3d 509] [CALJIC No. 8.85 does not preclude jurors from considering lesser mental or emotional disturbance as a mitigating factor in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments].) Defendant offers no persuasive reason to reconsider our prior decisions.

### B. *CALJIC No. 8.88*

Defendant contends various aspects of CALJIC No. 8.88[15] violated his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the

---

following factors, if applicable: [¶] . . . [¶] D, Whether or not the offense was committed while the defendant Gunner Jay Lindberg was under the influence of extreme mental or emotional disturbance. [¶] E, Whether or not the victim was a participant in defendant Gunner Jay Lindberg's homicidal conduct or consented to the homicidal act. [¶] F, Whether or not the offense was committed under circumstances which defendant Gunner Jay Lindberg reasonably believed to be a moral justification or extenuation for his conduct. [¶] G, Whether or not defendant Gunner Jay Lindberg acted under extreme duress or under the substantial domination of another person. [¶] H, Whether or not at the time of the offense the capacity of defendant Gunner Jay Lindberg to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease or defense or the effects of intoxication. [¶] . . . [¶] J, Whether or not defendant Gunner Jay Lindberg was a [*sic*] an accomplice to the offense and his participation in the commission of the offense was relatively minor. [¶] K, Any other circumstance which extenuates the gravity of the crime, even though it is not a legal excuse for the crime and any sympathetic or other aspect of defendant Gunner Jay Lindberg's character or record that the defendant offers as a basis for a sentence less than death, whether or not related to the offense for which he is on trial. You must disregard any jury instruction given to you in the guilt or innocence phase of this trial which conflicts with this principle."

[14] Defendant asserts the trial court's instruction under CALJIC No. 8.85 "infringed [defendant's] rights under the Eighth Amendment, *as well as state law*" but fails to identify the state law this instruction violates and provides no argument or authority in support. A matter asserted in a such a perfunctory manner is not properly raised. (*People v. Gionis* (1995) 9 Cal.4th 1196, 1214, fn. 11 [40 Cal.Rptr.2d 456, 892 P.2d 1199].)

[15] The trial court instructed the jury in the language of CALJIC No. 8.88, in relevant part, as follows: "It is now your duty to determine which of the two penalties, death or confinement in the state prison for life without possibility of parole shall be imposed upon the defendant

federal Constitution and corresponding provisions of the California Constitution. As defendant concedes, we previously have considered and rejected each of these arguments, and do so again now as defendant offers no persuasive reason to reconsider our prior decisions. We thus hold that CALJIC No. 8.88: (1) is not unconstitutional for failing to advise the jury that if the mitigating circumstances outweigh those in aggravation, it is required to return a sentence of life without the possibility of parole (*People v. Geier, supra*, 41 Cal.4th at p. 619); (2) is not unconstitutional for failing to inform the jury that it may return a sentence of life without the possibility of parole even in the absence of mitigating evidence (*People v. Moon* (2005) 37 Cal.4th 1, 43 [32 Cal.Rptr.3d 894, 117 P.3d 591]); (3) is not unconstitutionally vague in using the "so substantial" standard for comparing mitigating and aggravating circumstances (*People v. Geier, supra*, 41 Cal.4th at p. 619); and (4) is not unconstitutional because it requires the jury to decide whether the death penalty is "warranted" rather than "appropriate" (*People v. Carey* (2007) 41 Cal.4th 109, 137 [59 Cal.Rptr.3d 172, 158 P.3d 743]).

 Defendant further contends that, as applied in this case, CALJIC No. 8.88 misled the jury about its discretion to impose a sentence of life without possibility of parole, even if it determined the circumstances in aggravation outweighed those in mitigation or found no mitigation whatsoever. In support, he relies on a letter purportedly written by two jurors that was filed on October 16, 1997, after the jury returned its death verdict and before defendant was sentenced. This letter was not admitted into evidence at any proceeding. The circumstances under which it was filed, and by which party, if any, do not appear on the record. There is also nothing in the record to indicate the letter had been authenticated. (See *Continental Baking Co. v. Katz* (1968) 68 Cal.2d 512, 525 [67 Cal.Rptr. 761, 439 P.2d 889] [generally, a document must be authenticated in some manner before it is admissible in

Gunner Jay Lindberg. [¶] After having heard all of the evidence, and after having heard and considered the arguments of counsel, you shall consider, take into account, and be guided by the applicable factors of aggravating and mitigating circumstances upon which you have been instructed. [¶] An aggravating factor is any fact, condition or event attending the commission of a crime which increases its guilt or enormity or adds to its injurious consequences which is above and beyond the elements of the crime itself. A mitigating circumstance is any fact, condition, or event which does not constitute a justification or excuse for the crime in question, but may be considered as an extenuating circumstance in determining the appropriateness of the death penalty. [¶] The weighing of aggravating and mitigating circumstances does not mean a mere mechanical counting of factors on each side of an imaginary scale, or the arbitrary assignment of weights to any of them. You are free to assign whatever moral or sympathetic value you deem appropriate to each and all of the various factors you are permitted to consider. In weighing the various circumstances you determine under the relevant evidence which penalty is justified and appropriate by considering the totality of the aggravating circumstances, with the totality of the mitigating circumstances. [¶] To return a judgment of death, each of you must be persuaded that the aggravating circumstances are so substantial in comparison with the mitigating circumstances that it warrants death instead of life without parole."

evidence]; Evid. Code, §§ 1400, 1401.) In any event, the portions of the letter on which defendant relies describe the mental processes by which these jurors, and purportedly other jurors, reached the penalty verdict. Thus, even if the letter had been properly authenticated and admitted into evidence (e.g., at a hearing on defendant's motion for a new trial) we are precluded from considering such evidence on appeal. ▬ " '[A] verdict may not be impeached by inquiry into the juror's mental or subjective reasoning processes, and evidence of what the juror "felt" or how he understood the trial court's instructions is not competent.' " (*People v. Morris* (1991) 53 Cal.3d 152, 231 [279 Cal.Rptr. 720, 807 P.2d 949], quoting *People v. Sutter* (1982) 134 Cal.App.3d 806, 819 [184 Cal.Rptr. 829]; accord, *People v. Steele* (2002) 27 Cal.4th 1230, 1261 [120 Cal.Rptr.2d 432, 47 P.3d 225]; Evid. Code, § 1150, subd. (a).)

### C. *Instruction on the Meaning of a Sentence of Life Without Possibility of Parole*

Defendant contends the trial court was required to instruct the jury that a sentence of life without the possibility of parole meant that defendant would never be considered for parole. He acknowledges this court previously has rejected this argument (see *People v. Cox, supra*, 30 Cal.4th at p. 967), but asks that we reconsider these decisions in light of *Simmons v. South Carolina* (1994) 512 U.S. 154 [129 L.Ed.2d 133, 114 S.Ct. 2187], *Shafer v. South Carolina* (2001) 532 U.S. 36 [149 L.Ed.2d 178, 121 S.Ct. 1263], and *Kelly v. South Carolina* (2002) 534 U.S. 246 [151 L.Ed.2d 670, 122 S.Ct. 726]. We have considered the impact of these decisions by the high court in rejecting this argument. (*People v. Wilson* (2005) 36 Cal.4th 309, 352–355 [30 Cal.Rptr.3d 513, 114 P.3d 758]; *People v. Smith* (2003) 30 Cal.4th 581, 635–636 [134 Cal.Rptr.2d 1, 68 P.3d 302]; *People v. Prieto, supra*, 30 Cal.4th at pp. 269–271.) Defendant offers no persuasive reason to revisit our prior decisions.

### D. *Miscellaneous Constitutional Challenges to California's Death Penalty Statute*

Defendant contends California's death penalty law is unconstitutional on several grounds. We have previously rejected these arguments, and defendant fails to persuade us to reconsider our prior decisions.

California's death penalty scheme adequately narrows the class of death-eligible offenders. (*People v. San Nicolas, supra*, 34 Cal.4th at p. 676.)

California's use of capital punishment as an assertedly " 'regular form of punishment' " for substantial numbers of crimes, rather than as an extraordinary punishment for extraordinary crimes, does not offend the Eighth and

Fourteenth Amendments by violating international norms of human decency. (*People v. Leonard* (2007) 40 Cal.4th 1370, 1430 [58 Cal.Rptr.3d 368, 157 P.3d 973].)

Neither the federal nor state Constitution requires intercase proportionality review for death penalty cases. (*People v. Williams* (2006) 40 Cal.4th 287, 338 [52 Cal.Rptr.3d 268, 148 P.3d 47]; see *Pulley v. Harris* (1984) 465 U.S. 37, 50–51 [79 L.Ed.2d 29, 104 S.Ct. 871].)

### E. *International Law*

Defendant contends that California's death penalty scheme and his individual death sentence violate article VII of the International Covenant on Civil and Political Rights and the Eighth Amendment to the United States Constitution by violating "international human rights norms" and "evolving standards of decency."

We have consistently rejected this claim. (*People v. Geier, supra*, 41 Cal.4th at p. 620; *People v. Leonard, supra*, 40 Cal.4th at p. 1430; *People v. Ramirez, supra*, 39 Cal.4th at p. 479; *People v. Panah* (2005) 35 Cal.4th 395, 500–501 [25 Cal.Rptr.3d 672, 107 P.3d 790]; *People v. Hillhouse* (2002) 27 Cal.4th 469, 511 [117 Cal.Rptr.2d 45, 40 P.3d 754]; *People v. Ghent* (1987) 43 Cal.3d 739, 778–779 [239 Cal.Rptr. 82, 739 P.2d 1250].) Defendant fails to persuade us to reconsider these decisions.

### F. *Cumulative Error*

Defendant contends that the cumulative effect of the guilt and penalty phase errors requires reversal of his conviction and death sentence even if no single error compels reversal. Because we have either rejected on the merits defendant's claims of error or have found any assumed errors to be nonprejudicial, we reject his contention. We likewise reject defendant's contention with respect to the cumulative effect of any assumed errors.

### IV. CONCLUSION

The judgment is affirmed.

George, C. J., Baxter, J., Werdegar, J., Chin, J., and Corrigan, J., concurred.

**KENNARD, J.,** Concurring and Dissenting.—On the morning of January 29, 1996, the body of Thien Minh Ly was found on a high school tennis court. Ly, who was Vietnamese, had been stabbed repeatedly, 14 of the wounds entering his heart. About a month later, defendant confessed to stabbing "a

jap" to death, saying the killing was "for racial movement [*sic*]." After his arrest, two lists of names and addresses of White supremacist groups, together with printed materials issued by or describing these groups, were found in defendant's bedroom. Defendant was charged with Ly's murder, and with two special circumstance allegations: (1) the crime was committed in the course of an attempted robbery (Pen. Code, § 190.2, subd. (a)(17)(A)),[1] and (2) the victim was "intentionally killed because of" his "race, color, religion, nationality, or country of origin" (*id.,* subd. (a)(16)).

Police Sergeant Ronald Miller, the prosecution's expert witness on White supremacy groups, testified at the guilt phase of defendant's trial that some of the groups in which defendant had expressed interest were anti-Semitic. He described defendant as "definitely" being a White supremacist. On cross-examination, Miller acknowledged that he had never talked to defendant and did not know whether defendant belonged to any of the White supremacist organizations about which Miller had testified.

The jury found defendant guilty of the first degree murder of Ly; and it found true both special circumstance allegations. The jury returned a verdict of death. The majority affirms the judgment. I concur in the affirmance.

Unlike the majority, however, I am of the view that Sergeant Miller's testimony about the anti-Semitic beliefs of some White supremacist groups was irrelevant in this case and therefore should not have been admitted. Nonetheless, defendant was not prejudiced, as I explain below.

# I

Over defense objection, Sergeant Miller testified at trial to two of the major tenets of White supremacy groups: first, a belief in the "superiority of the White race" and a corresponding bias against all others; second, anti-Semitism so extreme that White supremacists "label the Holocaust as a Jewish trick to garner support and sympathy for the Jews throughout the world." Responding to the prosecutor's question about an organization called Church of Jesus Christ Christian, which appeared in a handwritten list of groups that was entered in defendant's Bible, Miller described that church's beliefs as "pseudo religion," mentioning its belief that "all Jews are the descendants of Satan." In Miller's opinion, the church's beliefs "fold[] right into the anti[-S]emitic" views common among White supremacists.

Examining a hand-decorated box found in defendant's bedroom, Sergeant Miller identified Nazi swastikas and the paired-lightning-bolt insignia of the

---

[1] All further statutory references are to the Penal Code.

World War II German army's elite SS corps, which Miller explained had been ordered by Adolf Hitler to exterminate "Jews, minorities, gypsies, homosexuals, and communists."

The police found in defendant's bedroom a letter to defendant from Brigadier General Jack Mohr. In his testimony, Sergeant Miller identified Mohr as a White supremacist leader. Also found in defendant's bedroom, and introduced into evidence by the prosecution, was a copy of a letter from Mohr to the Reverend Jerry Falwell. The prosecutor in his closing argument to the jury, explained that in this letter Mohr castigated Falwell for being "too nice to the Jews."

At the conclusion of the guilt phase, the trial court instructed the jury that in order to find the hate-murder special-circumstance allegation true it must find that "[t]he victim was intentionally killed and . . . the murder was committed because of race, religion, nationality or country of origin of the victim." To prove that a crime was committed "because of" a victim's protected characteristic, there must be evidence of a causal connection between a defendant's *perception* of the protected group to which the victim belongs and the defendant's infliction of injury on that victim. (See *In re M.S.* (1995) 10 Cal.4th 698, 717 [42 Cal.Rptr.2d 355, 896 P.2d 1365] [construing analogous language in § 422.6 and former § 422.7].)

Although Sergeant Miller here testified regarding the anti-Semitic views held by the Nazis and by various White supremacy groups in which defendant had shown considerable interest, there was no evidence, as the Attorney General acknowledged at oral argument, that defendant had ever expressed anti-Semitic views, and there was no evidence that defendant killed Ly, a Vietnamese man, because defendant perceived him to be of the Jewish faith. Thus, Sergeant Miller's testimony on the anti-Semitic views of some White supremacists lacked any relevance to the hate-murder special-circumstance allegation pertaining to Ly's murder and should not have been admitted into evidence.

According to the majority, Miller's testimony about anti-Semitism was relevant to "the general subject of White supremacy." (Maj. opn., *ante*, at p. 48.) If Miller's testimony about White supremacist groups had been solely focused on their belief in the superiority of Whites over all other racial and ethnic groups, I would agree that the testimony was relevant. But I am not persuaded that Miller's testimony regarding White supremacist groups' hatred of Jews establishes hatred of other non-White groups, and therefore Miller's specific testimony about anti-Semitism was irrelevant in this case, where the evidence shows that defendant killed Ly because of his race or country of origin. (See *In re M.S., supra*, 10 Cal.4th at pp. 730–731 (conc. opn. of Kennard, J.).)

## II

Although the trial court erred by admitting Sergeant Miller's testimony about the anti-Semitism of some White supremacist groups, the error was harmless, as discussed below.

Because the evidence showed that defendant was an admirer of White supremacist groups, Sergeant Miller's testimony that many such groups are anti-Semitic may have caused the jury to infer that defendant had similar views. Although evidence tending to show that a defendant was anti-Semitic could be highly prejudicial in another case, here the evidence overwhelmingly showed that defendant was a racist who regarded non-Whites as subhuman and who, by his own admission, callously murdered victim Ly "for racial movement" because defendant thought Ly was a "jap" or a "Chino." Given the compelling evidence that Ly's murder was a racially motivated hate crime, the trial court's erroneous admission of Miller's testimony that some White supremacist groups were anti-Semitic was harmless under any standard of prejudice and could not have affected the outcome of either the guilt or the penalty phase of defendant's trial.

Appellant's petition for a rehearing was denied November 12, 2008.