Filed 7/23/14  P. v. Salgado CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G048571 |
| v. | (Super. Ct. No. 11CF1101) |
| JUAN SALGADO, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, James Edward Rogan, Judge.  Affirmed.

John L. Dodd, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, and Barry Carlton, Deputy Attorney General, for Plaintiff and Respondent.

\*            \*            \*

INTRODUCTION

Defendant Juan Salgado appeals from the judgment entered after a jury found him guilty of one count of firearm possession by a felon and two counts of possession for sale of a controlled substance. The jury also found Salgado was personally armed when he committed one of the possession for sale of a controlled substance offenses within the meaning of former section 12022, subdivision (c) of the Penal Code. (All further statutory references are to the Penal Code unless otherwise specified.) Salgado admitted several prior conviction enhancement allegations.

We affirm. For the reasons we explain *post*, sufficient evidence supported Salgado's conviction for firearm possession by a felon and, under *People v. Bland* (1995) 10 Cal.4th 991 (*Bland*), the jury's true finding on the enhancement allegation Salgado was personally armed when he committed one of the possession for sale of a controlled substance offenses.

FACTS

Salgado stipulated that on May 5, 2006, he was convicted of felony possession for sale of a controlled substance in violation of Health and Safety Code section 11378.

On April 26, 2011, Detective Brian Jones of the Huntington Beach Police Department conducted "stationary surveillance" of a residence located on Sabina Street in Anaheim (the Sabina residence) in his investigation of Salgado's involvement in the sale of narcotics. Jones observed a man, identified as Ryan Tiss, arrive at the Sabina residence, in a black Chevy Tahoe. Jones saw Tiss, emptyhanded, enter the Sabina residence through the front door, then leave the residence, and return to his car, carrying a black laptop case with outer pockets that appeared to Jones to be very heavy. Tiss placed the case in the front passenger side of his vehicle; he then got into the front passenger

2

side. He remained there for about five minutes. Tiss, carrying the black case, then went back into the Sabina residence.

Jones observed another black vehicle arrive. Two people got out of that vehicle and entered the Sabina residence where they remained for about 15 to 20 minutes before leaving.

Jones saw Salgado emerge from the Sabina residence with another male and both get into a black Nissan Altima. Tiss also left the Sabina residence and got into the Tahoe. The Nissan and the Tahoe left in tandem, followed by a team of officers, including Detective Oscar Garcia of the Huntington Beach Police Department. Jones along with other officers remained at the Sabina residence. Garcia followed the two vehicles from the Sabina residence to the Westminster Mall; the two vehicles parked next to each other.

Garcia watched as Salgado got out of the Nissan, walked up to the Tahoe, spoke to the driver, and returned to the Nissan. The driver of the Nissan got out of the car, conversed with the driver of the Tahoe, and returned to the Nissan. As the Nissan started to drive away, Garcia and the other officers stopped and searched the vehicles. In the Tahoe, they found a black computer briefcase. Inside the briefcase was a black trash bag containing five vacuum-sealed packages enclosing five pounds of a white crystal-like substance that later tested positive for methamphetamine. The street value of five pounds of methamphetamine was $55,000. If the five pounds were broken down and sold in smaller portions, the street value would have increased to over $28,000 per pound.

Jones continued to watch the Sabina residence for over an hour after Salgado, Tiss, and the other officers drove away. Jones did not observe any more arrivals at or departures from the Sabina residence during that time. After Jones learned that a search warrant for the Sabina residence had been issued, he and members of a SWAT team executed the warrant. They encountered two individuals in the front yard of the

3

Sabina residence, from whom they learned that a particular bedroom at the front part of the Sabina residence was used by Salgado.

Paperwork addressed to Salgado, including a mailer from Radio Shack and a Radio Shack credit card with Salgado's name on them, was found inside Salgado's locked bedroom. A letter addressed to Salgado was found on the floor near the bed. No mail with anyone else's name on it was found in the bedroom. Inside the top drawer of the dresser, Jones found a clear plastic sandwich bag containing a white crystalline substance that he recognized as methamphetamine. The drawer contained two digital scales in working order; the weighing pads on both scales had a crystalline residue on them, which was consistent in appearance with methamphetamine. Jones also found a box of sandwich-sized Ziploc-style baggies and smaller sized Ziploc baggies.

Under the bed in Salgado's bedroom was a locked floor safe. Inside the safe were a Ziploc bag containing about 216 grams of methamphetamine; a smaller, coin-sized Ziploc baggie with a black spade logo on it, containing methamphetamine; a digital scale with methamphetamine residue on its weighing pad; a 2011 date book containing "pay and owe" sheets; and a white envelope containing twenty-five $20 bills.

A detached garage ran parallel to the Sabina residence; the garage door was about 10 feet away from the front door of the Sabina residence. A large, locked, red toolbox on wheels was in the center of the garage. In the top drawer, Jones found a handgun. In the middle drawer, he found a nine-millimeter Ruger semiautomatic handgun, a magazine for a nine-millimeter Ruger containing nine rounds of ammunition, and a chrome revolver. The guns were not loaded. Also in the middle drawer, Jones found a receipt from "Baran Auto House" for work done on a black BMW. The receipt had Salgado's name on it and identified a BMW vehicle that police officers had seen Salgado driving "on a pretty consistent basis." A black BMW was parked in the driveway of the Sabina residence at the time of the search. The receipt listed an address in Orange.

4

In June 2011, police officers searched another residence in Anaheim, used by Salgado. They found, inter alia, methamphetamine, pay/owe sheets, baggies, a cutting agent, and a digital scale, in his bedroom.

Jones testified that narcotics sellers "[t]ypically, if they do have a trail, like the address on a piece of mail, that could be like a safe location where they get mail picked up at, but they keep narcotics, money, at a separate location that's distant from them so you can't easily link it up unless you do an in-depth investigation to figure out where these other locations are because they try to keep them hidden from law enforcement." He also stated that a suspect might live at one house and keep "all the things linked to his criminal business . . . at another location; money, drugs[,] guns, whatever it may be. That's what they refer to as a stash house."

Jones also testified that the business of selling narcotics is a "dangerous business" because narcotics sellers have a lot of money or product on hand and are often susceptible to being robbed. Consequently, narcotics sellers usually have weapons, such as handguns, to protect themselves from being robbed.


BACKGROUND

Salgado was charged in an amended information (the information) with one count of possession of a firearm by a felon[1] in violation of former section 12021, subdivision (a)(1)[2] (count 1), and two counts of possession for sale of a controlled substance (methamphetamine) in violation of Health and Safety Code section 11378 (counts 2 and 3). As to counts 2 and 3, the information alleged, pursuant to section 1203.07, subdivision (a)(11), Salgado, on four occasions, was previously

---

[1] The information alleged Salgado had been previously convicted of possession for sale of a controlled substance in violation of Health and Safety Code section 11378.

[2] Former section 12021, subdivision (a)(1) is now section 29800, subdivision (a). (*People v. Montes* (2014) 58 Cal.4th 809, 819.)

5

convicted of possession of a controlled substance in violation of Health and Safety Code section 11378. The information further alleged that as to count 2, and pursuant to former section 12022, subdivision (c), Salgado was personally armed with a firearm during the commission and attempted commission of that offense.

The information also alleged Salgado had suffered four prior convictions for which he had served prison terms within the meaning of section 667.5, subdivision (b). As to counts 2 and 3, and within the meaning of Health and Safety Code section 11370.2, subdivision (c), the information alleged Salgado had suffered four prior convictions for violating Health and Safety Code section 11378.

During trial, Salgado admitted all of the prior conviction enhancement allegations. The jury found Salgado guilty as charged on all three counts and found true the enhancement allegation that he was personally armed with a firearm during the commission of count 2. The court imposed a total prison sentence of 18 years. Salgado appealed.

DISCUSSION

I.

APPLICABLE STANDARD OF REVIEW

"When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] . . . We presume in support of the judgment the existence of every fact the trier of fact reasonably could infer from the evidence. [Citation.] If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. [Citation.] A reviewing court neither

6

reweighs evidence nor reevaluates a witness's credibility. [Citation.]" (*People v. Lindberg* (2008) 45 Cal.4th 1, 27.) The testimony of a single witness, unless physically impossible or inherently improbable, is sufficient to support a conviction. (Evid. Code, § 411; *People v. Young* (2005) 34 Cal.4th 1149, 1181.)

II.

SUBSTANTIAL EVIDENCE SUPPORTED SALGADO'S
CONVICTION FOR POSSESSION OF A FIREARM BY A FELON.

Salgado contends insufficient evidence supported his conviction for possession of a firearm by a felon in violation of former section 12021, subdivision (a)(1). The elements of an offense under former section 12021, subdivision (a)(1) were (1) a felony conviction and (2) ownership, possession, custody, or control of a firearm. (*People v. Jeffers* (1996) 41 Cal.App.4th 917, 922.) Specific criminal intent is not required under former section 12021, subdivision (a)(1), and general criminal intent is sufficient to sustain a conviction. (*People v. Spirlin* (2000) 81 Cal.App.4th 119, 130.) Possession of the firearm may be actual or constructive as long as possession is intentional. (*Ibid.*)

Salgado stipulated at trial that he had suffered a prior conviction within the meaning of former section 12021, subdivision (a)(1). He solely challenges his conviction for violating that statute on the ground insufficient evidence showed he was in constructive possession of any of the firearms found in the toolbox. "To establish constructive possession, the prosecution must prove a defendant knowingly exercised a right to control the prohibited item, either directly or through another person. [Citations.] Possession may be shared with others. [Citation.] But mere proximity to the weapon, standing alone, is not sufficient evidence of possession." (*People v. Sifuentes* (2011) 195 Cal.App.4th 1410, 1417 (*Sifuentes*).)

Salgado does not challenge the jury's guilty verdicts as to counts 2 and 3 of possession of methamphetamine for sale. Substantial evidence showed that on the date

7

the Sabina residence and the garage were searched, Salgado was actively engaged in the business of selling methamphetamine, using the front bedroom of the Sabina residence, at a minimum, as a "stash house" for his operation. The typical indicia of narcotics sales were found inside Salgado's bedroom except for one—weapons to defend against would-be robbers of the large amounts of methamphetamine and cash often found at such a location.

It was reasonable to infer the five pounds of methamphetamine, valued at over $55,000 and found in the black briefcase in the Tahoe at the Westminster Mall, had been stored at the Sabina residence. Three firearms were found by the officers, who had searched the Sabina house and the garage, in a locked toolbox inside the garage. The entrance to the garage was a mere 10 feet from the front door of the Sabina residence, where Salgado's bedroom was located. The recovery of a receipt with Salgado's name on it, along with the description of the BMW car he had been observed driving on a consistent basis, located with two firearms and ammunition locked in the middle drawer of the toolbox, supported a finding Salgado had access to the firearms and ammunition. A reasonable jury could find Salgado knowingly exercised a right to control the firearms to protect his narcotics business if the need arose, and thus was personally armed, within the meaning of former section 12021, subdivision (a)(1).

*Sifuentes*, *supra*, 195 Cal.App.4th 1410, is factually distinguishable from this case. In *Sifuentes*, law enforcement officers found defendants Reno Sifuentes and Juan Lopez, who were both convicted felons, in a motel room with two women. (*Id.* at pp. 1413-1414.) When the officers entered the room, Sifuentes was lying on top of the bed nearest the door and Lopez was kneeling on the floor on the far side of the second bed. (*Ibid.*) A loaded handgun was later found under the mattress next to where Lopez had been kneeling. (*Ibid*.) A gang expert testified about Sifuentes's and Lopez's gang affiliations and further testified about the use of a "gang gun" shared freely among gang members in criminal street gangs. (*Id.* at pp. 1414-1415.)

A panel of this court held that insufficient evidence supported Sifuentes's conviction for violation of former section 12021, subdivision (a)(1), based on a theory of constructive possession. (*Sifuentes*, *supra*, 195 Cal.App.4th at p. 1419.) The court stated, inter alia, the prosecution's gang expert did not testify that *any* gun possessed by a gang member automatically constituted a gang gun shared by all other gang members, and no other evidence showed Sifuentes had the right to control the gun found under the mattress of the bed where Lopez was kneeling in the motel room. (*Id.* at p. 1417.)

Unlike the gun found in the motel room in which Sifuentes was present, here, as discussed *ante*, the firearms were found near Salgado's bedroom out of which he conducted narcotics sales. The firearms were accompanied with a receipt identifying Salgado in connection with a car he drove. *Sifuentes* is distinguishable.

III.

SUBSTANTIAL EVIDENCE SHOWED SALGADO WAS PERSONALLY ARMED
DURING THE COMMISSION OF COUNT 2, WITHIN THE MEANING OF
FORMER SECTION 12022, SUBDIVISION (c).

The jury found true the enhancement alleged as to count 2 under former section 12022, subdivision (c), which provided in pertinent part: "Notwithstanding the enhancement set forth in subdivision (a), any person who is personally armed with a firearm in the commission of a violation or attempted violation of Section . . . 11378 . . . of the Health and Safety Code, shall be punished by an additional and consecutive term of imprisonment pursuant to subdivision (h) of Section 1170 for three, four, or five years." The use of the word "personally" in former section 12022, subdivision (c) "was intended to distinguish personal from vicarious liability; that is, 'personally' refers to the person who acts, and not to his action." (*People v. Superior Court (Pomilia)* (1991) 235 Cal.App.3d 1464, 1468.) There was no requirement under former section 12022, subdivision (c), that narcotics offenders have "firearms upon their persons" rather than merely having "ready access to firearms." (*People v. Superior Court (Pomilia)*, *supra*, at

9

p. 1471.) Here, the trial court imposed a three-year consecutive prison term for the former section 12022, subdivision (c) enhancement.

In *Bland*, *supra*, 10 Cal.4th 991, 995, the California Supreme Court held: "[Former] section 12022 imposes an additional prison term for anyone 'armed with a firearm in the commission' of a felony. The question we resolve here is this: is a defendant convicted of a possessory drug offense subject to this 'arming' enhancement when the defendant possesses both drugs and a gun, and keeps them together, but is not present when the police seize them from the defendant's house? The answer is: yes." (Fn. omitted.) The court explained, "[o]ne who is armed with a concealed weapon may have the potential to harm or threaten harm to the victim and those who might attempt to interrupt the commission of the crime or effect an arrest." (*Id.* at p. 997.) The Supreme Court further explained: "[A]*rming* under the sentence enhancement statutes does not require that a defendant utilize a firearm or even carry one on the body. A defendant is *armed* if the defendant has the specified weapon available for use, either offensively or defensively. [Citations.] . . . '[I]t is the availability—the ready access—of the weapon that constitutes arming.' [Citation.]" (*Ibid.*)

The court in *Bland*, *supra*, 10 Cal.4th at pages 997-998, cited one appellate case in which "evidence that during the defendant's commission of a rape, a screwdriver left at the foot of the bed by the defendant's crime partner would have been visible to the defendant, was sufficient to show that the defendant was 'armed' with a deadly weapon during the rape. [Citation.]" The court cited another appellate case in which "a burglar who, before entering a house through a garage, left a loaded handgun on a low wall outside the garage, was found to be 'armed' in the commission of the burglary. [Citation.]" (*Id.* at p. 998.) The court also observed, "[s]o too a drug dealer who sold cocaine from his car was deemed to be 'armed' when he kept a loaded .357 Ruger in an unlocked compartment in the back of his car. [Citation.] In each case the firearm was available to the defendant to use in furtherance of the underlying felony." (*Ibid.*)

10

The Supreme Court in *Bland* stated: "[W]ith respect to felony drug possession, a defendant is armed 'in the commission' of that crime so long as the defendant had the firearm available for use in furtherance of the drug offense at some point during the defendant's possession of the drugs. Thus, by specifying that the added penalty applies only if the defendant is armed with a firearm 'in the commission' of the felony offense, [former] section 12022 implicitly requires both that the 'arming' take place during the underlying crime and that it have some 'facilitative nexus' to that offense. Evidence that a firearm is kept in close proximity to illegal drugs satisfies this 'facilitative nexus' requirement: a firearm's presence near a drug cache gives rise to the inference that the person in possession of the drugs kept the weapon close at hand for 'ready access' to aid in the drug offense." (*Bland*, *supra*, 10 Cal.4th at p. 1002, italics omitted.)

The Supreme Court further stated: "To summarize, when the prosecution has proved a charge of felony drug possession, and the evidence at trial shows that a firearm was found in close proximity to the illegal drugs in a place frequented by the defendant, a jury may reasonably infer (1) that the defendant knew of the firearm's presence, (2) that its presence together with the drugs was not accidental or coincidental, and (3) that, at some point during the period of illegal drug possession, the defendant was present with both the drugs and the firearm and thus that the firearm was available for the defendant to put to immediate use to aid in the drug possession. These reasonable inferences, if not refuted by defense evidence, are sufficient to warrant a determination that the defendant was 'armed with a firearm in the commission' of a felony within the meaning of [former] section 12022." (*Bland*, *supra*, 10 Cal.4th at pp. 1002-1003.)

Salgado does not challenge his underlying convictions for possession of methamphetamine for sale. As discussed *ante*, substantial evidence showed the firearms found inside the toolbox in the garage were in close proximity to the methamphetamine found, approximately 10 feet away, in Salgado's bedroom. Such evidence permitted the

11

jury to reasonably infer (1) Salgado knew of the firearms' presence, (2) their presence together with the methamphetamine was not accidental or coincidental, and (3) that, at some point during Salgado's illegal methamphetamine possession for sale, he was present with both the methamphetamine and the firearms and thus the firearms were available to him to put to immediate use to aid in his offense of possessing methamphetamine for sale. These reasonable inferences were not refuted by defense evidence and thus were sufficient to support the jury's true finding Salgado was armed with a firearm in the commission of a felony within the meaning of former section 12022, subdivision (c). (*Bland*, *supra*, 10 Cal.4th at p. 1003.)

## DISPOSITION

The judgment is affirmed.

FYBEL, J.

WE CONCUR:

RYLAARSDAM, ACTING P. J.

THOMPSON, J.

12